137 F.3d 1372
 46 ERC 1456, 28 Envtl. L. Rep. 21,073,
98 Cal. Daily Op. Serv. 1527,
98 Daily Journal D.A.R. 2155
 NEIGHBORS OF CUDDY MOUNTAIN and Idaho Sporting Congress,
Inc., Plaintiffs-Appellants,
v.
UNITED STATES FOREST SERVICE, an agency of the United States
Department of Agriculture, Defendant-Appellee,
and
Boise Cascade Corporation, Intervenor-Appellee.
 No. 97-35654.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1997.
Decided March 4, 1998.
 
 Thomas J. Woodbury, Boise, Idaho, for plaintiffs-appellants.
 D. Marc Haws, Boise, Idaho, for defendant-appellee.
 William R. VanHole, Boise, Idaho, for intervenor-appellee.
 Appeal from the United States District Court for the District of Idaho; Mikel H. Williams, Magistrate Judge, Presiding. D.C. No. 96-0553-S-MHW.
 Before: FLETCHER and O'SCANNLAIN, Circuit Judges and SCHWARZER,* District Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiffs seek to enjoin the sale of timber in the Cuddy Mountain area of Payette National Forest. They claim that the United States Forest Service (Forest Service), in determining whether such a sale could go forward, violated the National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. They appeal the district court's grant of summary judgment in favor of the Forest Service, and appeal the district court's decision to allow Boise Cascade Corporation to intervene as a defendant.
 
 
 2
 We have jurisdiction, 28 U.S.C. § 1291, and we reverse and remand to the Forest Service.
 
 I.
 
 3
 Plaintiffs seek to enjoin the Grade/Dukes timber sale in the Cuddy Mountain area of Payette National Forest (Payette) in Idaho. Plaintiffs are two not-for-profit groups, Neighbors of Cuddy Mountain and Idaho Sporting Congress (collectively, Neighbors), who seek to protect the environment in the Cuddy Mountain area. Neighbors challenges the Forest Service's analysis of the potential environmental impacts of the sale, contending that the Forest Service failed to comply with the substantive requirements of the NFMA, and failed to comply with the procedural requirements of NEPA. The defendant is the Forest Service. Boise Cascade Corporation, the company that was awarded the Grade/Dukes timber contract, was allowed to intervene as a defendant.
 
 
 4
 The Forest Service began investigating the sale of timber from the Grade/Dukes area of Cuddy Mountain in the late 1980's. The evaluation of the impact of the Grade/Dukes sale contained in the first Environmental Impact Statement released in 1990, recommended that the Forest Service be allowed to proceed with the Grade/Dukes Timber Sale. See Grade/Dukes Timber Sale in Cuddy Mountain Roadless Area Final Environmental Impact Statement (1990) (hereinafter, 1990 EIS). The Forest Supervisor issued his first Record of Decision, to proceed with the logging project, on August 6, 1991.
 
 
 5
 Following a challenge by a number of groups, the Deputy Regional Forester reversed the Forest Supervisor's decision and ordered the Forest Service to supplement the 1990 EIS with additional information. Specifically, the Forest Service was directed to provide more thorough analyses of how the project would affect various species in the project area and to complete biological evaluations (or show why they were not needed) as to a number of species. Additionally, the Forest Service was directed to review the cumulative effects of other proposed timber sales.
 
 
 6
 A supplemental EIS was completed in 1994, entitled Grade/Dukes Timber Sale Final Supplemental Environmental Impact Statement (February 1994) (hereinafter, 1994 SEIS). A second Record of Decision, again approving the sale but with some modifications, was issued in February, 1994. The decision involves the sale of 18.8 million board feet of timber.
 
 
 7
 On April 6, 1994, Neighbors appealed the second decision. Neighbors was notified in February, 1995 that the Regional Forester denied this appeal. While the appeal was pending, but before Neighbors was notified of the denial of its appeal, the Forest Service selected a contractor, Boise Cascade Corporation, which began logging in August, 1994.
 
 
 8
 Neighbors commenced this action in district court in December, 1996. The magistrate judge[1] granted Boise Cascade's motion to intervene as a matter of right, based on its status as the successful bidder in the Grade/Dukes sale. The court then granted summary judgment in favor of the defendant and intervenor, concluding that the Forest Service had analyzed sufficiently the impact of the proposed sale pursuant to the NFMA and NEPA. The defendant and intervenor also had asked the magistrate judge to dismiss Neighbors' action, arguing that the case was moot and barred by the equitable doctrine of laches. At the time the suit was brought, the road into the Grade/Dukes area had already been built and 30 percent of the logging completed. The magistrate judge declined to reach the laches issue because he had granted summary judgment in favor of the defendant and intervenor.
 
 II.
 
 9
 We review de novo the district court's grant of summary judgment. Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir.1997). Agency actions challenged under the NFMA are reviewed to determine if they were arbitrary and capricious, an abuse of discretion, or not in accordance with the law. Id. This applies to an agency's interpretations of its own regulations, and, "[t]his is especially true when questions of scientific methodology are involved." Inland Empire Public Lands Council v. U.S. Forest Serv., 88 F.3d 754, 760 (9th Cir.1996).
 
 
 10
 For actions challenging the adequacy of an EIS, brought under NEPA, we employ a rule of reason to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." Lowe, 109 F.3d at 526. Under this standard, review consists only of insuring that the agency took a "hard look." Id.
 
 
 11
 The rule of reason analysis and the review for an abuse of discretion are essentially the same. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 1861 n. 23, 104 L.Ed.2d 377 (1989).
 
 III.
 
 12
 The NFMA creates a statutory framework for the management of our national forests. It provides a two-step process for forest planning. Inland Empire, 88 F.3d at 757. The NFMA first requires the Forest Service to develop a Land Resource Management Plan (LRMP) and an EIS for the entire forest. Id.; 36 C.F.R. § 219.10(a), (b). A LRMP and EIS were prepared for Payette in May, 1988. Implementation of the LRMP occurs at the site-specific level. Thus, once the LRMP is in place, site-specific projects, such as the Grade/Dukes timber sale, are assessed by the Forest Service. Id.; 36 C.F.R. § 219.10(e). That assessment produced the two EIS's in the case at hand, as well as the supporting documents.
 
 
 13
 At both stages, NEPA imposes procedural requirements. For example, the need to prepare an EIS and the process by which an EIS is prepared is dictated by NEPA. See 40 C.F.R. Part 1501 et seq. The NFMA imposes substantive requirements at both stages, such as the need to insure biological diversity. See 36 C.F.R. Part 219, et seq.
 
 
 14
 A site-specific decision, such as one to sell timber, must be consistent with the LRMP for the larger area. See Inland Empire, 88 F.3d at 757; 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10(e).
 
 
 15
 Neighbors' claims are based on alleged failures of the Forest Service to abide by the procedural and substantive requirements of the NFMA and NEPA in conducting the analysis for the Grade/Dukes sale. On appeal, plaintiffs raise a number of specific arguments related to the Forest Services's decision. Neighbors is particularly concerned that the Grade/Dukes sale, alone and in combination with other timber sales in the Cuddy Mountain Roadless area, will greatly deplete the small amount of old growth habitat that remains in Payette. Old growth consists of the oldest trees in the forest, specifically, "mixed conifer, or grand-fir stand having: at least 15 trees/acre greater than 21 inches DBH, an average of .5 or more snags/acre greater than 21 DBH, two or more canopy levels, a canopy closure greater than 70 percent, and some trees with heart rot."[2] Old growth is the exclusive habitat for a number of species within Payette.
 
 
 16
 Neighbors is also concerned with the impact of this sale on fisheries in the area. We agree that the Forest Service has violated the NFMA by failing to insure that the Grade/Dukes sale is consistent with the Payette LRMP, and has failed to provide the requisite "hard look" mandated by NEPA.[3]
 
 A.
 
 17
 Pursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) ("[T]he Forest Supervisor shall ensure that ... all outstanding and future permits, contracts, cooperative agreements, and other instruments ... are consistent with the [land management] plan.").
 
 
 18
 The Payette LRMP, developed in 1988, requires that a certain percentage of old growth habitat be retained in Payette. A number of species in Payette rely on old growth habitat, including the pileated woodpecker, flammulated owl, great gray owl, and northern goshawk. The pileated woodpecker is the "management indicator species" for old growth habitat. A management indicator species "is used as a bellwether ... for the other species that have the same special habitat needs or populations characteristics." Inland Empire, 88 F.3d at 762 n. 11. Thus, by studying the result of the sale on the habitat for the pileated woodpecker, the Forest Service can estimate the effect of the sale on other old growth-dependent species. See 36 C.F.R. § 219.19(a)(1).
 
 
 19
 With regard to the specific percentage of old growth that must be retained in Payette, the Payette LRMP states:
 
 
 20
 Retain a minimum of 5 percent old growth or mature forest, of which 2.5 percent must be old growth habitat as defined by Thomas (1979), within each theoretical pileated woodpecker home range as described in the Forest planning documentation files. When insufficient old growth is provided from areas considered not appropriate or not suited for timber production, suited timber areas will be used to satisfy old growth habitat requirement. Old growth stands must be at least 30 acres in size.
 
 
 21
 Payette National Forest Land and Resource Management Plan (May 1988) (emphasis added).
 
 
 22
 Thus, to prove that the Grade/Dukes sale would be consistent with the Payette LRMP, the Forest Service should have shown that after the sale, there would be at least 5/2.5 percent of old growth "within each theoretical pileated woodpecker home range." The Forest Service has failed to do so. In fact, the Forest Service provides no information whatsoever regarding how many woodpecker home ranges there are within the sale area, or how many home ranges would be affected by the timber sale.[4] Having failed to do so, it certainly could not have demonstrated that after the sale, a sufficient percentage of old growth would remain in each affected pileated woodpecker home range. Instead, the Forest Service recited the results of a survey[5] to the effect that after the sale, there will be at least 5/2.5 percent of old growth in the Grade/Dukes sale area as a whole. In its final SEIS, the Forest Service stated:
 
 
 23
 The proposed sale area contains 430 acres of forest meeting Forest Plan old-growth definitions, approximately 14% of the total timbered acres in the analysis area. The Forest Plan states that a minimum of 5% of the total timbered acres (in an analysis area) must be retained as old-growth with at least one-half meeting the Forest Plan definition of old-growth, with the other one-half being in a mature/overmature condition.
 
 
 24
 Following the harvest, the Proposed Alternative would retain 136 acres of forest in an old-growth condition; however, 57 acres of that is a partially fragmented vein which is not representative of a 30 acre block as suggested by the Forest Plan. Therefore, the actual old-growth remaining in the analysis area would be 79 acres, or slightly greater than the Forest Plan minimum of 75 acres.
 
 
 25
 1994 SEIS (internal references omitted) (emphasis added). The "analysis area" appears to be the Grade/Dukes sale area, and not the woodpecker home range(s), as required. Indeed, in quoting from the Payette LRMP, the Forest Service inexplicably deleted from that portion of the statement describing the percentage of old growth that must be retained, the phrase that specifies the geographic scope that must be analyzed, i.e., the pileated woodpecker home range. Thus, the Forest Service did not comply with the requirements of the LRMP in so far as the Forest Service evaluated the "analysis area" rather than the "home range" of the pileated woodpecker. As such, it did not demonstrate that the Grade/Dukes project would be consistent with the Payette LRMP, and thus it failed to comply with the NFMA. As discussed below, this failure contributed to the Forest Service's inadequate cumulative impact analysis.[6]
 
 B.
 
 26
 NEPA requires that where "several actions have a cumulative ... environmental effect, this consequence must be considered in an EIS." City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir.1990). " 'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7.
 
 
 27
 Neighbors notes that three other timber sales are proposed for the Cuddy Mountain Roadless area: Emery Creek Timber Sale; Crooked River Timber Sale; and Grizzly Basin Timber Sale. Neighbors contends that the cumulative impact analysis completed for these sales is inadequate in terms of the sales' combined effect on depleting existing old growth habitat.[7] We agree. The Forest Service provided some information in regard to the cumulative effects of all proposed timber sales on old growth habitat, but the analysis provided was very general, and did not constitute the hard look that the Forest Service is obligated to provide under NEPA.
 
 
 28
 In the original EIS, the Forest Service included a section describing the cumulative effects on wildlife habitat. Regarding the pileated woodpecker and old growth habitat, the Forest Service noted:
 
 
 29
 Past timber harvest on private and National Forest System lands prior to development of the Forest Plan did not fully consider the needs of species dependent on mature and old growth habitat....
 
 
 30
 When viewed in light of past timber harvest, future conversion of remaining mature and old growth forests surrounding Cuddy Mountain to young forest could isolate pileated woodpecker populations on Cuddy Mountain if the distance between suitable forested habitats becomes greater than the flight range of dispersing birds. It is not known to what degree this may be occurring. Isolation of other species is also possible. The consequence of population isolation could lead to a long-term decline and loss of a species within a local area. This does not mean that timber management on Cuddy Mountain should not be implemented, but as future timber sales are planned on and adjacent to the area, consideration must be given to the distribution of adequate old growth and mature forest habitat.
 
 
 31
 There is some risk that the remaining mature and old growth forests on Cuddy Mountain may not be adequate in size, if isolated from adjacent suitable habitat, to maintain the dependent species. On the Forest overall, there is an abundance of mature and old growth forest habitat. The pileated woodpecker population is expected to remain static and be evenly distributed throughout the Forest through 2030. To ensure that this occurs on the westside of the Forest, a system should be implemented to monitor change in the mature and old growth forest habitat. This could provide the information to assess the cumulative effects on the pileated woodpecker and other mature and old growth dependent species.
 
 
 32
 1990 EIS. The SEIS provided a few additional comments. The Forest Service concluded:
 
 
 33
 In general, timber harvest has reduced habitat for species dependent on mature/overmature and old-growth habitat, although it has improved habitat for species dependent on early successional stages of old-growth. Monitoring will be conducted to determine timber harvest activity effects upon old growth dependent species....
 
 
 34
 Future timber sales over the next several years would propose to treat additional old-growth habitat. Management strategies including mitigation for old-growth dependent species such as presented in the Proposed Alternative, as well as strategic placement of old-growth areas deferred from harvest will ensure continued species persistence.
 
 
 35
 1994 SEIS. Other than these statements, however, the Forest Service has provided no detail regarding the extent to which the proposed sales would cumulatively impact and reduce old growth habitat. Significantly, the Forest Service has failed to even mention the number or percentage of trees meeting the definition of old growth that would be destroyed by the three other proposed timber sales in the Cuddy Mountain Roadless area, and whether the sales would affect the same pileated woodpecker home ranges that would be affected by the Grade/Dukes sale. The sole reference to future sales stated, "Future timber sales over the next several years would propose to treat additional old-growth habitat."
 
 
 36
 In accord with NEPA, the Forest Service must "consider" cumulative impacts. 40 C.F.R. § 1508.25(c). To "consider" cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide. Such a mandate is also consistent with the Forest Service's duties under the NFMA. For example, when estimating the effects of a particular project on fish and wildlife populations, the Forest Service "shall estimate the effects of changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species." 36 C.F.R. § 219.19(a)(1). Further, "[p]lanning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2). General statements about "possible" effects and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided. See, e.g., Inland Empire, 88 F.3d at 764 (noting that "NEPA does not require the government to do the impractical.").
 
 
 37
 Nor is it appropriate to defer consideration of cumulative impacts to a future date. "NEPA requires consideration of the potential impact of an action before the action takes place." City of Tenakee Springs, 915 F.2d at 1313 (emphasis in original). Because the three proposed sales in this case were "reasonably foreseeable," the Forest Service was obligated to assess the cumulative impact of all sales on the availability of old growth habitat for the pileated woodpecker.
 
 C.
 
 38
 Neighbors also claims that the Forest Service's description of the mitigating measures it would impose to off-set the damage the Grade/Dukes sale would do to the redband trout habitat in the three streams affected by the sale is insufficient, in violation of NEPA. Redband trout is a management indicator species.
 
 
 39
 The NFMA requires that objectives for the maintenance (or improvement) of habitat for a management indicator species be established for each alternative action that the Forest Service is considering. See 36 C.F.R. § 219.19(a). This can be accomplished by either monitoring population trends or by evaluating suitable habitat. See Inland Empire, 88 F.3d at 759-62. In its analysis of the fish habitat in the streams potentially affected by the Grade/Dukes sale, the Forest Service described the increase in sedimentation that would result from each sale alternative that was being considered by the Forest Service. Consistent with its duty to describe adverse environmental impacts, 42 U.S.C. § 4332(2)(C)(ii), the Forest Service concluded that the Grade/Duke sale would result in increased sedimentation in three creeks: Dukes Creek, Grade Creek, and Brownlee Creek.
 
 
 40
 Having so found, the Forest Service was obligated to describe what mitigating efforts it could pursue to off-set the damages that would result from the sale. See 40 C.F.R. § 1502.16(h) (stating that an EIS "shall include discussions of ... [m]eans to mitigate adverse environmental impacts"). The Forest Service's discussion of mitigation consisted of the following:
 
 
 41
 [S]mall increases in sedimentation and other effects of logging and road construction in Grade and Dukes creeks would be mitigated by improvements in fish habitat in other drainages.... Even minor improvements in other drainages, such as Wildhorse River or the Weiser River, would affect more fish habitat than exists in Grade and Dukes creeks. (See Forest Plan, page IV-38 for a list of offsetting mitigation projects.)
 
 
 42
 Offsetting mitigation would include such projects as riparian enclosures (fences around riparian areas to keep cattle out) and fish passage restoration (removing fish passage blockages). These activities can be effective but cannot be quantified with present data.
 
 
 43
 1990 EIS. The Forest Service's perfunctory description of mitigating measures is inconsistent with the "hard look" it is required to render under NEPA. "Mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.' " Carmel-By-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir.1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 353, 109 S.Ct. 1835, 1847-48, 104 L.Ed.2d 351 (1989)). "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." Northwest Indian Cemetery Protective Ass'n. v. Peterson, 795 F.2d 688, 697 (9th Cir.1986), rev'd on other grounds, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).
 
 
 44
 While acknowledging that the Grade/Dukes sale would negatively impact the redband trout by increasing sedimentation levels, the Forest Service did not discuss which (or whether) mitigating measures might decrease the increased sedimentation in the three creeks affected by the timber sale. In fact, we read the EIS as suggesting that the Forest Service did not even consider mitigating measures for the creeks actually affected by the sale, apparently because the Forest Service believes that mitigating measures elsewhere in Payette could "compensate" for the harms caused to the three creeks in the Grade/Dukes area. It is also not clear whether any mitigating measures would in fact be adopted. Nor has the Forest Service provided an estimate of how effective the mitigation measures would be if adopted, or given a reasoned explanation as to why such an estimate is not possible. The Forest Service's own experts suggest that the mitigation measures suggested by the Forest Service "are not mitigation and are so general that it would be impossible to determine where, how, and when they would be used and how effective they would be." See Administrative Record at 4788. The Forest Service's broad generalizations and vague references to mitigation measures in relation to the streams affected by the Grade/Dukes project do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide.
 
 IV.
 
 45
 The magistrate judge did not reach the laches issue because he granted summary judgment in favor of the Forest Service. Because we remand directly to the Forest Service, we consider the Forest Service's equitable defense of laches.
 
 
 46
 To establish the doctrine of laches as an affirmative defense, the party seeking to invoke the doctrine must show: (1) that the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence. Apache Survival Coalition v. United States, 21 F.3d 895, 905 (9th Cir.1994). The doctrine is to be invoked sparingly in environmental cases because the plaintiff is not the only party to suffer harm by alleged environmental damage. See Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1241 (9th Cir.1989) (citing Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 854 (9th Cir.1982)). "We have repeatedly cautioned against application of the equitable doctrine of laches to public interest environmental litigation.... This approach has found unanimous support in the other circuits." Id. (citations omitted).
 
 
 47
 This is not one of the rare cases in which it is appropriate to invoke the doctrine of laches to bar a suit brought on the public's behalf by a group seeking to protect the environment. Whether or not Neighbors exercised diligence in pursuing this action, the Forest Service has not produced cognizable evidence of prejudice resulting from the alleged delay.[8] Thus, we conclude that this action is not barred by the doctrine of laches.
 
 
 48
 The Forest Service has not produced specific evidence demonstrating how or why it might be prejudiced if logging were to be interrupted so that further analysis might be done, or permanently enjoined if the Forest Service cannot ultimately prove that the Grade/Dukes sale would be consistent with the Payette LRMP, or its obligations under the NFMA or NEPA. It is undisputed that the road into the Grade/Dukes area has been built and that approximately 30 percent of the logging had been completed before this action was commenced. Neighbors does not ask that the road be destroyed. Rather, it seeks to enjoin further logging. Arguably, the government would lose money on the logging contract and may be liable to Boise Cascade for the interruption or cancellation of the contract. The Forest Service has not, however, put forth any evidence of this type of effect, either in its brief to this court or to the district court.[9]
 
 
 49
 More importantly, this is not the type of harm that is properly considered in a laches analysis. Prejudice in environmental actions is measured by "what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent ... is now irreversible." Apache Survival Coalition, 21 F.3d at 912. To this end, courts have analyzed both the money spent on a project and the extent to which a project has progressed so far that "the harm [plaintiffs] fear" has already occurred. Id. at 912-13; see also Daingerfield Island Protective Soc'y v. Lujan, 920 F.2d 32, 39 (D.C.Cir.1990) (noting that courts will examine whether the relief sought by plaintiffs is still practicable). In this case, the court has no information regarding expenditures, and because Neighbors seeks only to halt further logging, it cannot be said that the harm it fears, the removal of more trees, has become irreversible, or that the relief it seeks, an injunction, is impracticable. Because we ask only that the Forest Service conduct the type of analysis that it is required to conduct by law, an analysis it should have done in the first instance, it is difficult to ascertain how the Forest Service can suffer prejudice by having to do so now.
 
 
 50
 Moreover, "this is not a case where a dam or nuclear power plant has already been built," Portland Audubon, 884 F.2d at 1241, or in which delays in the project would result in a breakdown of an international coalition or loss of a project to a foreign site, Apache Survival Coalition, 21 F.3d at 913. Rather, it is one involving the protection of old growth forests. As we noted in Portland Audubon, "The old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce. The forests will be enjoyed not principally by plaintiffs and their members but by many generations of the public...." 884 F.2d at 1241.
 
 V.
 
 51
 The Forest Service, by failing to establish that the Grade/Dukes sale would be consistent with the Payette LRMP in terms of the sale's impact on existing old growth habitat, has violated the NFMA. The Forest Service also failed to provide a sufficient cumulative impact analysis as to the combined effect of a number of proposed timber sales on old growth habitat, in violation of NEPA. Likewise, it has failed to describe adequately the mitigating measures it would provide to off-set the increased sedimentation it has admitted would occur in three streams as the result of the Grade/Dukes sale. This too violates NEPA.
 
 
 52
 The Forest Service's affirmative defense of laches fails because it has not shown prejudice. We have not ruled on Neighbors' argument that the magistrate judge erred in allowing Boise Cascade to intervene. It is not necessary to do so because we remand directly to the Forest Service to conduct the analyses it is required to conduct under the NFMA and NEPA.
 
 
 53
 Accordingly, we REVERSE and REMAND to the Forest Service for further proceedings consistent with this opinion. Future logging in the Grade/Dukes area is enjoined until such studies are satisfactorily completed in compliance with the NFMA, NEPA, and the Payette LRMP.
 
 
 
 *
 Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The parties expressly consented to have a magistrate judge preside over their action. 28 U.S.C. § 636(c)
 
 
 [2]
 This definition is from the Grade/Dukes Timber Sale Final Supplemental Environmental Impact Statement
 
 
 [3]
 We reject Neighbors' other arguments regarding the adequacy of the review conducted for the Grade/Dukes sale in a memorandum disposition filed contemporaneously with this opinion
 
 
 [4]
 We do know from the Payette National Forest Eight-Year Monitoring Report (July, 1996), that there are 42 home ranges within the entire forest, and that each range is approximately 10 miles in diameter. The Eight-Year report was not part of the administrative record prepared for the Grade/Dukes sale as the report was prepared after the sale had been approved
 
 
 [5]
 We note that the Forest Service provided only a cursory description of its survey of old growth in the sale area, and has at no time provided the actual survey results. It is impossible to determine the exact geographic scope of the survey, and whether the survey evaluated pileated woodpecker home ranges as it should have
 
 
 [6]
 We reject Neighbors' argument that the Forest Service was obligated to show that there would be at least 5/2.5 percent of old growth after the sale in Payette as a whole. The Payette LRMP states only that the Forest Service must retain 5/2.5 percent of old growth in each pileated woodpecker home range
 
 
 [7]
 There are three other proposed or on-going sales in the area: Woodsy, Inseid and Heath Timber Sales. Neighbors has not suggested that the cumulative impact analysis done in regard to these sales was inadequate
 
 
 [8]
 We do not rule on Neighbors' argument that the magistrate judge erred in allowing Boise Cascade to intervene. It is not necessary to do so because we remand directly to the Forest Service for further analysis. We note, however, that even if we assume that Boise is a proper party to this action, Boise cannot demonstrate the type of prejudice that we would consider in determining whether laches should apply. See discussion of Apache Survival Coalition, 21 F.3d at 895, infra
 The type of harm at issue in the instant case is harm to the environment. We know of no case in which a private company's economic loss was considered pertinent to the analysis of a laches defense.
 
 
 [9]
 In the government's Memorandum in Support of [its] Motion to Dismiss, submitted to the district court, the government discusses only Neighbors' inexcusable delay in bringing the action