153 F.3d 1059
 29 Envtl. L. Rep. 20,070, 98 Cal. Daily Op.
Serv. 6948,
98 Daily Journal D.A.R. 9582
 FRIENDS OF SOUTHEAST'S FUTURE; Sitka Conservation Society;
and Southeast Alaska Conservation Council,
Plaintiffs-Appellants-Cross-Appellees,
v.
Gary MORRISON, Forest Supervisor, Chatham Area, Tongass
National Forest; U.S. Forest Service,
Defendants-Appellees-Cross-Appellants.
 Nos. 97-35157, 97-35346.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 13, 1998.
Decided Sept. 3, 1998.
 
 Douglas A. Ruley (argued), Earthjustice Legal Defense Fund, Juneau, Alaska, for plaintiffs-appellants-cross-appellees.
 David C. Shilton (argued), Robert L. Klarquist, Bruce M. Landon, Michael A. Gheleta, United States Department of Justice, Washington, D.C.; James Ustasiewski, United States Department of Agriculture, Washington, D.C., for defendants-appellees-cross-appellants.
 Appeals from the United States District Court for the District of Alaska; H. Russel Holland, District Judge, Presiding. D.C. No. CV-96-00011-HRH.
 Before: FARRIS, O'SCANNLAIN, and HAWKINS, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether the Forest Service violated both the National Environmental Policy Act and the National Forest Management Act in approving a timber sale on national forest lands in Alaska.
 
 
 2
 * This litigation concerns proposed sales by the Forest Service of 67 million board feet of timber from the Ushk Bay area of the Tongass National Forest ("Forest") in southeast Alaska.
 
 
 3
 The Forest is managed pursuant to the Tongass Land Management Plan ("Forest Plan"). The Forest Plan, issued in 1979,[1] divides the Forest into 867 value comparison units ("VCUs"), and classifies each VCU according to a land use designation ("LUD"). LUD I lands are wilderness. LUD II lands are managed in a roadless state, but some recreational facilities are allowed. LUD III lands are managed for a variety of uses, including timber harvesting. Finally, LUD IV areas are devoted mainly to resource use and development. The Ushk Bay Project Area consists of VCUs 279-81. VCU 279 is an LUD III area, while VCUs 280-281 are LUD IV areas.
 
 
 4
 The Forest Plan provides that the Forest Supervisor is responsible for conducting an "area analysis" to determine where and when logging will occur in the Forest. The Plan describes the area analysis process as follows:
 
 
 5
 Each Forest Supervisor is responsible for identifying, on a case by case basis, the relevent [sic] geographic area; the social, resource, and management considerations which will be assessed; and the relative level of analysis necessary. The Supervisor may choose to address several projects on a large area or a single project on a smaller area. The analysis usually will include evaluation of specific project alternatives in order to determine the feasibility and environmental affects [sic]. The analysis will follow the NEPA process, provide opportunity for public comment, and conform to Regional and National Forest Service direction.
 
 
 6
 In 1991, the Forest Service developed a "Tentative Operating Schedule" for the Chatham Area of the Forest. This schedule was prepared in consultation with the Alaska Pulp Corporation ("APC"), with whom the Forest Service was under a long-term contract to provide 100 million board feet of timber per year. The Tentative Operating Schedule listed seven proposed logging projects, including one involving Ushk Bay. Accompanying the schedule was a letter from Forest Supervisor Gary Morrison which stated that the "enclosed tentative schedule is subject to revision under the modified contract."
 
 
 7
 On May 8, 1992, the Forest Service issued a notice of intent to prepare an environmental impact statement ("EIS") for the proposed Ushk Bay project. A draft environmental impact statement for the project was completed in June 1992, and a final environmental impact statement followed in September 1994. The EIS defined the objectives of the project as follows:
 
 
 8
 The purpose of this project is to consider specific alternatives for harvesting timber within the [Ushk Bay] project area given the guidance in the Tongass Land Management Plan (TLMP), as amended (USDA Forest Service 1979, 1986a). The TLMP presently directs us to manage most of the Project Area for intensive resource use and development, with an emphasis on commodity resources. Furthermore, the TLMP specifically schedules timber sale preparation for the entire Project Area.
 
 
 9
 The proposed vegetation management and timber production within the Ushk Bay Project Area specifically addresses three identified needs. These are: (1) to implement Forest Plan direction for the Project Area; (2) to help meet market demand for timber in Southeast Alaska; and, (3) to move toward the desired future condition for the Project Area by harvesting mature stands of suitable timber and replacing them with faster growing, managed stands of second growth timber, capable of long-term timber production....
 
 
 10
 The final EIS proposed five "action" alternatives for the Ushk Bay timber sale. These alternatives varied in terms of proposed timber harvest from 46.5 million board feet to 90.3 million board feet. The EIS also considered a "no-action" alternative, but did not adopt it on the ground that "it would not meet the purpose and need of the project." After completion of the NEPA process, Forest Supervisor Gary Morrison issued a Record of Decision ("ROD") published in September of 1994. The ROD adopted "alternative F," which would result in the harvest of 67 million board feet of timber and require the construction of 42.4 miles of road.
 
 
 11
 Sitka Conservation Society ("Sitka") filed an administrative appeal of the ROD, alleging that the Forest Service had failed to comply with the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"). The Forest Service denied the appeal, whereupon Sitka, joined by Friends of Southeast's Future ("Friends") and Southeast Alaska Conservation Council ("Southeast"),[2] brought suit alleging: (1) that the Forest Service violated NEPA because (a) it did not issue an EIS in conjunction with the 1991 Tentative Operating Schedule, and (b) the 1994 EIS inappropriately foreclosed discussion of the no-action alternative; and (2) that the Forest Service violated NFMA when it failed to follow the Area Analysis provisions of the Forest Plan.
 
 
 12
 The district court held that Friends' NEPA claim failed because: (1) the 1994 Ushk Bay EIS adequately considered various alternatives to the proposed action, including the no-action alternative; and (2) no additional NEPA compliance was required in conjunction with the Tentative Operating Schedule issued in 1991. However, the district court held that the Forest Service did violate NFMA because it followed procedures for approving the timber sale that were inconsistent with the procedures required by the Tongass Forest Plan. Accordingly, the court enjoined the Forest Service from proceeding with the Ushk Bay timber sale "until [it had] fully complied with the requirements of the Forest Plan with respect to that project."
 
 II
 
 13
 NEPA mandates the preparation of an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS is "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions." Merrell v. Thomas, 807 F.2d 776, 777-78 (9th Cir.1986). The EIS also ensures that the public is informed about the environmental impact of such actions. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
 
 
 14
 Friends challenges both (1) the Forest Service's decision not to prepare an EIS in 1991 and (2) the adequacy of the EIS that the Forest Service did prepare in 1994. We consider each challenge in turn.
 
 
 15
 * We must uphold the Forest Service's decision that preparation of an EIS was not required in 1991 unless that decision was unreasonable. See Friends of the Earth v. Hintz, 800 F.2d 822, 836 (9th Cir.1986). Similarly, in reviewing the EIS that the Forest Service did prepare in 1994, we must determine whether it contained "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir.1992) (internal quotations and citation omitted). We must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Id. (quoting California v. Block, 690 F.2d 753, 761 (9th Cir.1982)). In determining whether the EIS contains a "reasonably thorough discussion," we may not "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies...." Swanson v. United States Forest Serv., 87 F.3d 339, 343 (9th Cir.1996) (internal quotations and citation omitted). That is to say, once we are satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, our review is at an end. Id.
 
 
 16
 This court has held that an EIS is required at the point when a federal agency makes an "irreversible and irretrievable commitment of the availability of resources." Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848, 852 (9th Cir.1979); see also Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1225 (9th Cir.1988); California v. Block, 690 F.2d 753, 761 (9th Cir.1982). Friends maintains that the Forest Service made an "irreversible and irretrievable commitment" of the resources of Ushk Bay when, in February 1991, it prepared a Tentative Operating Schedule to plan for its long-term contract with the Alaska Pulp Corporation. Therefore, Friends argues, the agency should have prepared an EIS in 1991.
 
 
 17
 The Forest Service's Tentative Operating Schedule states:
 
 
 18
 The [Alaska Pulp Corporation] Long Term Sale Contract (7/1/90 revision) requires ... that the Forest Service in consultation with purchaser will determine, for each existing and proposed Operating Area, the projected annual rate of harvest, if a four-year supply of timber is available, and the projected volume needed to provide a four-year supply of available timber. A tentative operating schedule is to be developed which will list the current timber supply and schedule NEPA process for sufficient additional timber for four years of operations.
 
 
 19
 In a table in the schedule entitled "Future Planning Volume," the "planning start date" for Ushk Bay is listed as January 1992.
 
 
 20
 Our previous decisions compel the conclusion that this schedule did not constitute an "irreversible and irretrievable commitment" of resources, and therefore did not require preparation of an EIS. In Conner v. Burford, 848 F.2d 1441 (9th Cir.1988), we examined whether federal agencies violated NEPA by selling oil and gas leases on national forest land in Montana without preparing an EIS. We held that the sale of an "NSO lease"--defined as a lease that "absolutely forbid[s] the lessee from occupying or using the surface of the leased land"--does not constitute the "go/no go point of commitment at which an EIS is required." Id. at 1447-48. However, we also held that "non-NSO leases"--defined as leases which "do not reserve to the government the absolute right to prevent all surface-disturbing activity"--cannot be sold without preparation of an EIS, because non-NSO leases represent an irretrievable commitment of resources. Id. at 1448-51; see also Bob Marshall Alliance, 852 F.2d at 1227-28 (discussing Conner ).
 
 
 21
 Under Conner, whether an agency action constitutes an "irreversible and irretrievable commitment of resources" turns on whether that schedule "reserve[s] to the government the absolute right" to prevent the use of the resources in question. Conner, 848 F.2d at 1449. Like the NSO leases which did not require an EIS in Conner, the Tentative Operating Schedule at issue here "make[s] no commitment of any part of the national forests ... because the government retains absolute authority to decide whether any such activities will ever take place on the ... lands." Id. at 1447. That is, the schedules do not compromise the government's "absolute right to prevent all ... activity." Id. at 1449. Therefore, the schedule does not constitute an irretrievable commitment of resources.
 
 
 22
 Contrary to Friends' suggestion, the Forest Service did not commit itself to a certain volume of timber when it prepared the Tentative Operating Schedule. As the district court stated, "[t]he agency was free to follow [the Tentative Operating Schedule] or alter it as conditions warrant." Indeed, while the schedule uses a target figure of 89 million board feet for the sale area, the agency ultimately decided to allow the harvest of only 67 million board feet.
 
 
 23
 In support of its argument that the district court erred in holding that the Tentative Operating Schedule did not constitute an "irreversible and irretrievable commitment," Friends relies heavily on National Wildlife Federation v. United States Forest Service, 592 F.Supp. 931 (D.Or.1984). In National Wildlife, the plaintiffs argued that an EIS was required in conjunction with a "Seven Year Action Plan" which set out the general locations of timber sales and timber volumes for each sale. See id. at 936. The court held that the Action Plan constituted a proposal for a major federal action:
 
 
 24
 The Seven Year Action Plan implements an orderly timber sale program in the Mapleton District by the careful planning and selection of sale areas. The tentative nature of some of the sales is irrelevant.... [In] Port of Astoria v. Hodel, 595 F.2d 467 (9th Cir.1979), ... [t]he court required the Bonneville Power Administration (Bonneville) to prepare an environmental impact statement on the plan in spite of Bonneville's objections that the contracts were contingent and the details uncertain. In Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848 (9th Cir.1979), the Department of the Interior argued that an environmental impact statement was not required for a water marketing program because the number of water customer contracts was uncertain. The court required an environmental impact statement. Here the Forest Service has selected seventy-five timber sales and decided their locations, road construction requirements, and appropriate board foot harvest levels.... The Forest Service's long-range marketing program, like the programs in Port of Astoria and Environmental Defense Fund, constitutes a proposal under NEPA.
 
 
 25
 Id. at 939.
 
 
 26
 Neither Port of Astoria nor Environmental Defense Fund (the two Ninth Circuit cases relied upon by the district court in National Wildlife ) counsels reversal here. In Environmental Defense Fund, we held that an EIS was required in conjunction with a water marketing program where the government had entered into option contracts for the sale of water for industrial uses, even though some of the option contracts had not been executed. See Environmental Defense Fund, 596 F.2d at 851. Environmental Defense Fund is consistent with our later decision in Conner, because the sale in Environmental Defense Fund of option contracts tied to a particular resource amounted to the government's surrender of the "absolute right to prevent all ... activity" with respect to that resource. Conner, 848 F.2d at 1449. Similarly, in Port of Astoria, we held that the execution of a contract which changed the site of a proposed plant from one Oregon county to another required the preparation of an EIS. See Port of Astoria, 595 F.2d at 477. Like the options at issue in Environmental Defense Fund, the contract in Port of Astoria compromised the government's absolute right to prevent activity in the relevant area.
 
 
 27
 Both Port of Astoria and Environmental Defense Fund are consistent with Conner. However, to the extent that National Wildlife suggests that an EIS must be prepared where the government has not surrendered its absolute right to prevent the use of resources, National Wildlife is in conflict with Conner, and is therefore not persuasive precedent. Under Conner, an EIS is not required unless an agency action constitutes an "irreversible and irretrievable commitment of resources," which exists only where the government surrenders its "absolute right" to prevent the use of those resources. Conner, 848 F.2d at 1449. Because Friends fails to point to any evidence in the record demonstrating that the government compromised its absolute right to prevent logging at Ushk Bay when it prepared the Tentative Operating Schedule in 1991, Conner dictates that no EIS was required at that time.
 
 
 28
 Moreover, in the section of its brief devoted to the adequacy of the EIS which the Forest Service ultimately did prepare in 1994, Friends seemingly concedes that, even three years after preparation of the 1991 Tentative Operating Schedule, the government had still not irreversibly and irretrievably committed the resources of Ushk Bay to logging. Friends states:
 
 
 29
 [The agency] could have scheduled enough projects to preserve the possibility of selecting the no-action alternative on some of them and still meet volume goals. It could have broadened the scope of the project EIS to encompass alternative project locations that would leave Ushk Bay and Poison Cove intact. Most directly, it could have reassessed its goals and openly considered whether maintaining the roadless area and other natural values might be more important than meeting a timber sale schedule set years before.
 
 
 30
 Appellants/Cross-Appellees' Brief at 33 (emphasis added). Friends' statement that, as of 1994, the Forest Service could still have "reassessed its goals and openly considered ... maintaining the roadless area" undermines its argument that the agency's Tentative Operating Schedule constituted an irreversible and irretrievable commitment of resources.
 
 B
 
 31
 Friends next contends that, even if the commitment to log in Ushk Bay was not made in 1991, the EIS ultimately prepared by the Forest Service in 1994 was illegal because it foreclosed meaningful consideration of the no-action alternative.
 
 
 32
 An EIS must describe and analyze alternatives to the proposed action. See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 729 (9th Cir.1995). Indeed, the alternatives analysis section is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal. See Idaho Conservation League, 956 F.2d at 1520. The existence of reasonable but unexamined alternatives renders an EIS inadequate. See Alaska Wilderness Recreation & Tourism Ass'n, 67 F.3d at 729.
 
 
 33
 Among the alternatives to be considered in an EIS is the no-action alternative. In Bob Marshall Alliance, this court explained that "[i]nformed and meaningful consideration of alternatives--including the no action alternative--is ... an integral part of the statutory scheme." Bob Marshall Alliance, 852 F.2d at 1228 (emphasis added). However, as this court has recognized on a number of occasions, "merely because a 'no action' proposal is given a brief discussion does not suggest that it has been insufficiently addressed." See Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1181 (9th Cir.1990); Oregon Natural Resources Council v. Lyng, 882 F.2d 1417, 1423 n. 5 (1989) ("The fact that the description of the no-action alternative is shorter than those of the other proposals does not necessarily indicate that the no-action alternative was not considered seriously. It may only reveal that the forest service believed that the concept of a no-action plan was self-evident while the specific timber sale plans needed explanation."), amended by 899 F.2d 1565 (9th Cir.1990).
 
 
 34
 Friends argues that the Forest Service did not consider no-action as a meaningful alternative. The section of the Ushk Bay EIS which discusses the no-action alternative states:
 
 
 35
 Alternative A, the No-Action Alternative would result in no timber harvest and no construction of roads or LTFs. Existing log storage activities in Poison Cove would continue because of the ongoing need for a staging area to go through Sergius Narrows during favorable tide stages. Continuing harvest activities outside the Ushk Bay Project Area from various timber sale areas north and east of Sitka may require the transport of logs through the Narrows. This could require expansion of that storage into Ushk Bay, under permits for which applications have been submitted, even without timber harvest in the Ushk Bay Project Area.
 
 
 36
 The No-Action Alternative would not meet the purpose and need of the project. It is included here, in compliance with NEPA regulations, to provide a baseline against which the action alternatives are evaluated.
 
 
 37
 Following the release of the EIS, the Forest Service responded to public criticism about a perceived lack of meaningful alternatives. In response to a comment that "Alternative A [the no-action alternative] should not be dismissed just because it doesn't meet the purpose and need," the Forest Service stated:
 
 
 38
 The Code of Federal Regulations (40 CFR 1502.14(d)) requires that agencies shall "include the alternative of No Action." This alternative is required within all NEPA analyses to provide a benchmark to compare outputs and effects, even though this alternative does not meet the purpose and need of the project. For Ushk Bay, the Forest Service had identified Alternative A as the no-action alternative. The outputs and environmental effects of Alternative A are shown in all tables, figures, and graphs within the Final EIS where alternatives are analyzed.
 
 
 39
 Meanwhile, in response to a comment that the EIS did not "[c]onsider alternatives that are not necessarily consistent with management direction and purpose/need," the Forest Service stated:
 
 
 40
 The primary basis for the purpose and need for the Ushk Bay project is providing 89 MMBF of timber to meet market demand. It is not reasonable to consider alternatives that would provide volume of substantially less than 100 MMBF since the purpose and need of the project would not be met.
 
 
 41
 Friends argues that, by defining the "purpose and need for the Ushk Bay project" so narrowly as to make no-action "unreasonable," the Forest Service unlawfully circumvented the requirement that it undertake an "[i]nformed and meaningful" consideration of the no-action alternative. Bob Marshall Alliance, 852 F.2d at 1228. However, this court has afforded agencies considerable discretion to define the purpose and need of a project. See City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir.1986). In City of Angoon, this court examined the adequacy of an EIS prepared in conjunction with a permit for the construction and operation of a log transfer facility on Admiralty Island. See id. at 1017. The district court had held that the EIS was inadequate under NEPA because it failed to consider an alternative under which the land on the island could be exchanged for land elsewhere. See id. In so doing, the district court rejected the government's statement of the permit's purpose. On appeal, we held that the district court's failure to defer to the government's statement of purpose was error. We explained:
 
 
 42
 The district court attacked the Corps' statement of the permit's purpose. Purporting to rely on the Corps' regulations, the district court restated the purpose in terms of a broad, generic public benefit: "commercial timber harvesting." ... The Corps characterized the relevant "purpose and need" as providing a "safe, cost effective means of transferring timber...." The district court erred when it adopted as the "purpose and need" the even broader concept "commercial timber harvesting." This formulation appears to make a broad social interest the exclusive "purpose and need." The Corps' statement is more balanced. We have said before, "The preparation of [an EIS] necessarily calls for judgment, and that judgment is the agency's." Acceptance of the Corps' statement of purpose makes consideration of the exchange alternative irrelevant. When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.
 
 
 43
 Id. at 1021 (emphasis added) (internal citations omitted).
 
 
 44
 As Friends correctly argues, the discretion we have afforded agencies to define the purposes of a project is not unlimited. In City of Carmel-by-the-Sea v. United States Department of Transportation, 123 F.3d 1142 (9th Cir.1997), we observed that "an agency cannot define its objectives in unreasonably narrow terms." Id. at 1155. In support of this statement, we cited then-Judge Thomas's opinion in Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C.Cir.1991), which states:
 
 
 45
 [A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.
 
 
 46
 Id. at 196; see also City of New York v. United States Dep't of Transp., 715 F.2d 732, 743 (2d Cir.1983) ("[A]n agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered.").
 
 
 47
 The combined teaching of City of Angoon and City of Carmel-by-the Sea is that the Forest Service's statement of purposes is to be evaluated under a reasonableness standard. See City of Carmel-by-the Sea, 123 F.3d at 1155. The Forest Service's purpose and need statement provides:
 
 
 48
 The purpose of this project is to consider specific alternatives for harvesting timber within the project area given the guidance in the Tongass Land Management Plan (TLMP), as amended.... The TLMP presently directs us to manage most of the Project Area for intensive resource use and development, with an emphasis on commodity resources. Furthermore, the TLMP specifically schedules timber sale preparation for the entire Project Area.
 
 
 49
 The proposed vegetation management and timber production within the Ushk Bay Project Area specifically addresses three identified needs. These are: (1) to implement Forest Plan direction for the Project Area; (2) to help meet market demand for timber in Southeast Alaska; and (3) to move toward the desired future condition for the Project Area by harvesting mature stands of suitable timber and replacing them with faster growing, managed stands of second growth timber, capable of long-term timber production....
 
 
 50
 This purpose and need statement is not unreasonable. One of the purposes it sets forth is to "meet market demand for timber in Southeast Alaska." Another is "to implement Forest Plan direction for the Project Area." The Forest Plan, in turn, lists among its goals: (1) "Wilderness[:] The goal is to manage approximately 35-percent of the Forest as Wilderness including several large, nationally recognized areas, as well as a number of smaller areas representing the different landscape character types of southeast Alaska"; (2) "Timber[:] The goal is to make enough timber available from National Forest lands to maintain current levels of timber-related employment within the context of the total timber available from other land ownerships"; (3) "Visual[:] The goal is to maintain the scenic qualities of the most highly viewed landscapes on the Forest by managing many of these areas in ways which would not modify them significantly"; (4) "Fish[:] The goal is to maintain and enhance the natural fisheries resources by managing some of the highest quality watersheds in ways which would not modify them significantly"; and (5) "Wildlife[:] The goal is to maintain and enhance the natural productivity of the Forest's wildlife habitat by managing many of the highest quality areas in ways which would not significantly modify them."[3]
 
 
 51
 This statement of purposes permitted the Forest Service to evaluate a wide range of action alternatives in the 1994 EIS. These alternatives varied in terms of proposed timber volume from 46.5 million board feet to 90.3 million board feet. Whereas alternative B provided for the construction of 36 miles of roads, alternative E provided for 65. Whereas alternative E was projected to create 509 jobs, the selected alternative is projected to create 375. All of these alternatives are reasonably consistent with the purposes and needs of the project, because they aim to balance the Forest Plan's wilderness, fish, and wildlife goals with the need to meet timber demands. By contrast, the no-action alternative is plainly inconsistent with the project's overarching purposes and needs, because whatever other goals it may serve, it would not help to meet timber demands. As we stated in Angoon, "[w]hen the purpose [of the project] is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." Angoon, 803 F.2d at 1021. Accordingly, we hold that the Forest Service did not act unreasonably in rejecting the no-action alternative on the ground that it would not meet the purpose and need of the proposed project.
 
 III
 
 52
 In its cross-appeal, the Forest Service argues that the district court erred in holding that the agency violated NFMA by failing to conduct an "area analysis" for the proposed project. The NFMA provides: "Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i); see also 36 C.F.R. § 219.10(e) ("[T]he Forest Supervisor shall ensure that ... all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the [land management] plan.").
 
 
 53
 The district court concluded that the proposed timber sale violated NFMA because: (1) the sale involved instruments for the use of the Tongass National Forest; (2) prior to its amendment in 1997, the Tongass Forest Plan required the Forest Supervisor to conduct an area analysis (in addition to preparing a site-specific EIS) to determine where and when logging is to occur in the Forest; and (3) the Forest Supervisor never conducted an Area Analysis in connection with the proposed sale. Accordingly, the district court concluded that the Forest Service had failed to comply with the statutory requirement that "instruments for the use ... of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i).
 
 
 54
 * In Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d 1372 (9th Cir.1998), we examined whether the Forest Service had complied with the requirements of NFMA in the context of a proposed sale of timber in the Cuddy Mountain area of the Payette National Forest. We stated that, "[p]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." Id. at 1377. We held that the proposed sale deviated from the Payette Land Resource Management Plan because the Forest Service failed to establish "that a certain percentage of old growth habitat [would] be retained in Payette." Id. Therefore, we enjoined the sale on the ground that the "Forest Service ha[d] violated the NFMA by failing to insure that the [timber] sale [was] consistent with the [land management plan.]" Id.
 
 
 55
 Under Neighbors of Cuddy Mountain, we must affirm the district court's decision to enjoin the Ushk Bay timber sale if that sale is inconsistent with the Tongass Land Management Plan.[4] See id. Friends maintains (and the district court held) that the proposed Ushk Bay sale is inconsistent with the Forest Plan because the Forest Service failed to conduct the "area analysis" process required by the Plan. Among the purposes of area analysis (according to the Plan) are: (1) to "[d]etermine the general feasibility of implementing ... proposed projects"; (2) to "[i]dentify optimal locations (i.e. sites and/or routes) for the feasible projects"; and (3) to "[p]rovide opportunities for the involvement of potentially affected interests." The process is required to include the following steps: (1) scoping ("identify[ing] issues and concerns related to the proposed projects"); (2) collecting and interpreting data; (3) developing alternative ways of implementing the proposed projects "based on the [pertinent] physical, biological, social, and economic conditions"; (4) estimating the effects of these alternatives; and (5) identifying the preferred alternatives.
 
 
 56
 Another "tier" of analysis required by the Forest Plan is "project implementation." Whereas area analysis is designed to identify optimal locations for projects, project implementation is tailored to determine how a project will be carried out at a particular site. The Forest Plan states:
 
 
 57
 Project implementation will normally consist of detailed site planning and project design within the project locations identified through Area Analysis, followed by project execution and administration. NEPA procedures will be followed and project-related environmental analysis will be tiered to the appropriate Area Analysis documentation....
 
 
 58
 The Forest Service maintains that it conducted both the area analysis step and the project implementation step when it prepared the site-specific EIS for the Ushk Bay project in 1994. Friends responds that, while the site-specific EIS may have been enough to comply with the Forest Plan's project-implementation requirement, it did not meet the Plan's area-analysis requirement.
 
 
 59
 Friends contends that, under the Forest Plan, area analysis must be conducted before a project-specific EIS, as opposed to being conducted within a project-specific EIS. This interpretation is supported by the Forest Plan's statement that "[p]roject implementation will normally consist of detailed site planning and project design within the project locations identified through Area Analysis. " Moreover, in discussing the project-implementation step, the Plan states that "NEPA procedures will be followed and project-related environmental analysis will be tiered to the appropriate Area Analysis documentation." Friends contends that the Plan's use of the word "tiered" refers to the coverage of general matters in a broader analysis followed by a second narrower analysis which incorporates the prior discussion. This interpretation is confirmed by 40 C.F.R. § 1508.28, which states:
 
 
 60
 "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently provided.
 
 
 61
 40 C.F.R. § 1508.28 (emphasis added).
 
 
 62
 Viewed in conjunction with the Tongass Plan's statement that each area analysis "will be tiered" to the appropriate project-implementation step, 40 C.F.R. § 1508.28 undermines the Forest Service's argument that the two steps may be conducted simultaneously. As the Forest Service correctly argues, its interpretation of its own regulation is entitled to substantial deference. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). However, an agency's interpretation does not control, where, as here, it is plainly inconsistent with the regulation at issue. See id. In view of the unambiguous text of 40 C.F.R. § 1508.28, we reject the Forest Service's argument that it was not required to conduct an area analysis prior to the project-specific EIS.
 
 
 63
 Even assuming that area analysis could be conducted within a project-specific EIS, the Forest Service's contention that the Ushk Bay EIS satisfied the area analysis requirement fails. The Forest Service contends that Appendix A of the Ushk Bay EIS adequately describes the Forest Service's reasons for choosing to log in the Ushk Bay area (rather than other areas potentially available for harvest), thereby fulfilling the area analysis requirement. However, to analyze in an appendix of an EIS the reasons for choosing a specific site after analyzing in the body of the EIS the specifics of implementing a project at that site is to put the cart before the horse. The Forest Service's decisions concerning the elimination of alternative sites were made before the Ushk Bay EIS. Because these choices were made without opportunity for public comment, this process violated the Forest Plan's requirement that area analysis "[p]rovide opportunities for the involvement of potentially affected interests." As the district court correctly concluded, Appendix A of the 1994 EIS is merely "an after-the-fact justification of the federal defendants' decision to log in the region proposed for the Ushk Bay sale rather than outside that region."B
 
 
 64
 The Forest Service argues in the alternative that, even if the Ushk Bay sale was not "consistent" with the Forest Plan when the sale was first approved, it became consistent with the Plan when the Plan was amended in 1997 to remove the area analysis requirement. That is, the Forest Service contends that, even if the district court was correct to enjoin the timber sale, we should nevertheless allow the sale to proceed because of amendments to the Forest Plan approved after the district court's decision. The Forest Service's Record of Decision for the amendments states:
 
 
 65
 On January 10, 1997, a federal court held in Friends of Southeast's Future v. Morrison, No. J96-011-CV, 1998 WL 556516 (1998) that the Uskh Bay Timber Sale project did not properly undertake an "Area Analysis" the court found was required by the 1979 TLMP. The Court also upheld the sale against claims that it violated the NEPA. The Forest Service continues to believe that the Ushk Bay Timber Sale satisfied all the requirements of the 1979 TLMP and has appealed the district court's decision. In any event, this Record of Decision and the revised Plan remove any requirements for "Area Analysis." The Ushk Bay timber sale and any similarly situated timber sale are specifically allowed to proceed in accordance with the standards and guidelines that were in effect at the time the NEPA decision document for the project was signed, but without undertaking any "Area Analysis."
 
 
 66
 The Forest Service's position seems to be that, because the sale is consistent with most aspects of the old Forest Plan (that is, everything but the area analysis requirement) and one aspect of the new Plan (that is, the absence of an area analysis requirement), it satisfies the consistency requirement of 16 U.S.C. § 1604(i). However, that statute requires timber sales to be consistent with a single Forest Plan, see Neighbors of Cuddy Mountain, 137 F.3d at 1377, not selected elements of two Plans.
 
 
 67
 The Forest Service contends that retroactive application of the area analysis provisions of the amended Plan (or, more accurately, the lack thereof) is authorized by NFMA. We disagree. In Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), the Supreme Court held that agency authority to change the legal consequences of completed acts only exists if Congress conveys such authority in an "express statutory grant." Id. at 208, 109 S.Ct. 468 (emphasis added); see also Landgraf v. USI Film Prods., 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The Forest Service contends that such a grant of authority is contained in 16 U.S.C. § 1604(i), which provides that "instruments for the use and occupancy of National Forest System lands ... currently in existence shall be revised as soon as practicable to be made consistent with [land management plans.]" However, by its plain language, this provision only applies to the revision of instruments to achieve consistency with forest plans, not to the revision of the forest plans themselves.
 
 
 68
 Moreover, as Friends points out, the legality of the timber sale is not a foregone conclusion under the new Plan, despite the removal of the area analysis requirement. Friends maintains that, in addition to eliminating the area analysis process, the amendments added several new standards and guidelines which the district court never had an opportunity to address. Because the record before us is not sufficiently developed to permit the application of the 1997 amendments to the proposed sale, we decline to rule on whether that sale is permissible under the amended Plan.[5]
 
 IV
 
 69
 In summary, we affirm the district court's holding that the Forest Service did not violate NEPA either by failing to issue an EIS in 1991 or by issuing an inadequate EIS in 1994. We also affirm the district court's holding that the Forest Service violated NFMA by failing to make the proposed timber sale consistent with the procedural provisions of the Tongass Land Management Plan.
 
 
 70
 AFFIRMED.
 
 
 
 [1]
 The Forest Plan has been amended several times. Unless otherwise noted, all references in this opinion to the Plan are to the 1986 version. The Plan was most recently amended in 1997. The 1997 amendments to the Plan are discussed in Part V
 
 
 [2]
 Hereinafter, the plaintiffs are collectively referred to as "Friends."
 
 
 [3]
 This list is not exhaustive. Other goals discussed in the Forest Plan concern: (1) recreation; (2) tourism; (3) hydroelectric power; (4) road corridors; and (5) minerals
 
 
 [4]
 We are cognizant that in Ohio Forestry Assoc., Inc. v. Sierra Club, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), the Supreme Court concluded that certain provisions of the Wayne National Forest Land and Resource Management Plan did not create legal obligations. See id. at 1670. The Court explained:
 [T]he provisions of the Plan that the Sierra Club challenges do not create adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm.... [T]hey do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees' being cut.
 Id.
 Even assuming arguendo that the Tongass Forest Plan does not, in and of itself, create legal obligations, it does not follow that 16 U.S.C. § 1604(i) also does not create legal obligations. That is to say, it does not follow from the proposition that rule X is not legally binding that the same must be true of a statute providing that "Y shall be consistent with rule X." Here, 16 U.S.C. § 1604(i) plainly imposes a legal obligation on the Forest Service to ensure that timber sales are consistent with the relevant Forest Plan. See Neighbors of Cuddy Mountain, 137 F.3d at 1377.
 
 
 [5]
 The Forest Service must ensure consistency with the amended Plan before the sale may proceed. See 16 U.S.C. § 1604(i) ("[Instruments for the use and occupancy of National Forest System lands] currently in existence shall be revised as soon as practicable to be made consistent with [land management] plans.")