John **GAULE**; Ann **Gaule**;, et al., Plaintiffs,

v.

Joseph **MEADE**, et al., Defendants.

No. A05–0020CV(RRB).

United States District Court, D. Alaska.

Nov. 23, 2005.

## ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT

BEISTLINE, District Judge.

### I. INTRODUCTION

Before the Court are Plaintiffs with a Motion for Partial Summary Judgment in which they argue that the Defendants ("Forest Service") should not have issued a heli-ski permit within the Chugach National Forest because the Forest Service: (1) failed to include any analysis of the wildlife mitigation measures in the final environmental impact statement; (2) failed to take a hard look at the direct, indirect, and cumulative impacts of heli-skiing on wildlife; and (3) failed to properly analyze CPG's economic viability.[1] Defendants oppose and argue that: (1) the challenge to the permit for the exploratory areas is moot; (2) the analysis of mitigation measures is adequate; (3) the analysis of direct, indirect, and cumulative impacts is adequate; and (4) the analysis of alternatives was adequate.[2] Oral argument was heard on October 27, 2005.

The Court is sensitive and frankly sympathetic to the concerns raised by Plaintiffs. It is certainly not difficult to understand why some might be dismayed by noisy helicopter traffic in the midst of an otherwise pristine wilderness, and it is reasonable to conclude that such traffic might impact local wildlife. The area in question, however, is a National Forest, where a variety of activities are permitted. One form of activity that the Forest Service may permit is heli-skiing, an activity that is growing in popularity and that some find both exhilarating and aesthetically pleasing. However, before issuing a permit, the Forest Service must comply with the National Environmental Protection Act ("NEPA"), which requires the Forest Service to consider the extent to which the permitted activity may impact the environment. And, if the activity in question might significantly impact the environment, an Environmental Impact Statement ("EIS") must be prepared to publically address the environmental issues raised and to prevent uninformed decisions.

NEPA does not require the Forest Service to safeguard any specific species or habitat, but it does require an open and transparent procedure. This apprises the public of the compromises and sacrifices that result from the permitted activity, so that the public can exert political pressure, if desired, regarding Forest Service policy.

Plaintiffs in the present case, while proceeding with the best of intentions, seem to believe that the Forest Service must restrict its permitting to activities that will not significantly impact the environment and ask that the Forest Service withhold permits in situations where a specific, quantifiable impact cannot be given. However, in the context of a National Forest where the area is vast and the wildlife involved are migratory and elusive, the degree of certainty Plaintiffs seek cannot be reasonably obtained. For example, although wolverines are known to migrate through heli-ski terrain and often den on hillsides, no dens have been identified in the permitted area. And, frequently, a

---

1. Clerk's Docket No. 29 at 2.

2. Clerk's Docket No. 34.

solution that satisfies one concern exacerbates another. For instance, while mountain goats and Dall sheep prefer south-facing slopes, wolverines and denning bears prefer north-facing slopes. If the Forest Service were required to know what it cannot know and solve insolvable conflicts before issuing permits, human activities in the National Forests would likely end.

As discussed later, in the present case, the Forest Service appears to have been sensitive to all of the wildlife concerns and properly considered the mitigation measures, the impacts of heli-skiing on wildlife, and the viability requirements for the heli-ski operator. Therefore, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** (Clerk's Docket No. 29).

## II. FACTS

At issue here is the United States Forest Service's approval of the Commercially Guided Helicopter Skiing on the Kenai Peninsula Final Environmental Impact Statement ("FEIS") and entry of the Record of Decision ("ROD") allowing Chugach Adventure Guides LLC dba Chugach Powder Guides ("CPG") "to conduct large-scale commercial helicopter skiing operations" within designated portions of the Chugach National Forest.[3] The FEIS and ROD were issued in September of 2004.[4] After administrative appeals, the Forest Service issued a final decision in December of 2004 and issued a supplemental decision concerning cumulative effects from summer activities in January of 2005.[5] The Forest Service issued the permit to CPG on February 3, 2005.[6]

The permit issued to CPG allows for heli-skiing operations to be conducted on over 200,000 acres of the Chugach National Forest.[7] This includes nine "core units," where the permit authorizes "1,800 client days of helicopter skiing under a five-year permit on 159,100 acres."[8] The permit also includes four "exploratory units," where the permit authorizes "CPG to conduct 400 days of helicopter skiing under a one-year permit on 102,600 acres."[9] The permit for the exploratory units expired on April 20, 2005.[10] Finally, the ROD authorized six staging areas.[11]

Plaintiffs now seek judicial review of the adequacy of the FEIS.

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[12] The moving party need not present evidence; it needs only point out the lack of any

---

3. Clerk's Docket No. 3 at 2.

4. Clerk's Docket No. 29 at Ex. 1 at 19 and Ex. 2 at Cover.

5. *Id.* at Ex. 6 and 7.

6. *Id.* at Ex. 8.

7. *Id.* at Ex. 1 at 2. The ROD also included "deferred exploratory units" that were cleared by this decision, but were not included in the CPG permit. *Id.*

8. *Id.*

9. *Id.*

10. Clerk's Docket No. 34 at Ex. 1 at 1.

11. Clerk's Docket No. 29 at Ex. 1 at 3.

12. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

genuine dispute as to material fact.[13] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[14] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[15] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[16]

## B. Administrative Procedure Act Standard

In general, judicial review of actions under NEPA is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[17] NEPA mandates the preparation of an EIS for any major Federal action "significantly affecting the quality of the human environment."[18] The twin objectives of NEPA are to (1) require the federal agency to "consider every significant aspect of the environmental impact of a proposed action," and to (2) ensure that the agency "inform[s] the public that it has indeed considered environmental concerns in its decision-making process."[19] "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements."[20]

The APA provides two separate standards applicable to this case. First, when a party complains that an EIS fails to comply with the requirements of NEPA, the APA provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and shall be overturned by the court.[21] Under this standard, the court "will set aside agency actions that are adopted 'without observance of procedure required by law.' " '[22]

Second, when reviewing the adequacy of an EIS, the Court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action."[23] Under the "rule of reason," the Court determines "whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."[24] "Under this standard, which is essentially applied in the same manner as the arbitrary and capricious standard, review consists only of

13. *Id.* at 323–25, 106 S.Ct. 2548.

14. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

15. *Id.* at 255, 106 S.Ct. 2505.

16. *Id.* at 248–49, 106 S.Ct. 2505.

17. *Earth Island Inst. v. United States Forest Serv.,* 351 F.3d 1291, 1300 (9th Cir.2003).

18. *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1062 (9th Cir.1998)(citing 42 U.S.C. § 4332(C)).

19. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)(internal citations omitted).

20. *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 523 (9th Cir. 1994).

21. 5 U.S.C. § 706(2)(A).

22. *Natural Res. Def. Council v. United States Forest Serv.,* 421 F.3d 797, 810 n. 27 (9th Cir.2005)(quoting 5 U.S.C. § 706(2)(D)).

23. *Laguna Greenbelt,* 42 F.3d at 523 (quotation omitted).

24. *Kern v. United States Bureau of Land Mgmt.,* 284 F.3d 1062, 1071 (9th Cir.2002)(internal citation omitted).

ensuring that the agency has taken a 'hard look' at the environmental effects of the proposed action." [25]

Judicial review under the APA is generally confined to the administrative record before the agency.[26] However, in a separate order, the Court granted Plaintiffs' motion to consider extra-record evidence because of specific exceptions to the general rule.[27]

## IV. DISCUSSION

### A. Mootness

Defendants argue that, "[t]o the extent plaintiffs' challenge to the Forest Service's compliance with NEPA is directed to the permit issued to CPG for operations on exploratory use areas, that action is moot." [28] Plaintiffs oppose and argue that the exploratory issue is not moot, and that even if it is, a mootness exception applies.[29]

█ Federal courts lack jurisdiction to decide moot cases.[30] An actual controversy must exist at all stages of the litigation.[31] When the issues are no longer live or the parties lack a legally cognizable interest in the outcome, the case is moot.[32] However, there is a well-established exception to the mootness doctrine for cases in which the challenged conduct has ceased, but such conduct "is capable of repetition, yet evading review." [33] Government ac-

tions fall within this exception when "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." [34] The burden of demonstrating mootness "is a heavy one." [35]

█ Plaintiffs argue that the exploratory area issue is not moot because the "FEIS and ROD purport to satisfy all of the Forest Service's obligations under NEPA with respect to both core and exploratory areas." [36] The ROD states that for the nine exploratory units, "[a]uthorization in subsequent years will be dependent upon actual use levels, the amount of disturbance to nearby communities, and other monitoring and implementation requirements and will occur at the discretion of the respective District Ranger." [37] There is no requirement for further NEPA analysis before future heli-skiing permits are granted in these areas. Thus, even though the permit expired, a live controversy remains because the Forest Service considers the FEIS and ROD sufficient to allow the issuance of future permits in these units for heli-skiing.

Even if the exploratory area issue is moot, the exception for conduct that is capable of repetition, but likely to evade

**25.** *Center for Biological Diversity v. United States Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir.2003) (internal citation omitted).

**26.** *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

**27.** Clerk's Docket No. 45.

**28.** Clerk's Docket No. 34 at 14.

**29.** Clerk's Docket No. 40 at 3–6.

**30.** *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir.2002).

**31.** *Los Angeles County v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).

**32.** *Id.*

**33.** *Natural Res. Def. Council v. Evans*, 316 F.3d 904, 910 (9th Cir.2003).

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

**37.** Clerk's Docket No. 29 at Ex. 1 at 2.

review, applies. The Forest Service agrees that the first prong of the test is met, that "the duration of the challenged action is too short to allow full litigation before it ceases." Thus, the only question is whether "there is a reasonable expectation that the plaintiffs will be subjected to [the challenged action] again." The Court agrees that there is such a reasonable expectation. While the ROD subjects future permits to the listed factors, there is no requirement for formal NEPA review and the agency could continue to rely on this FEIS.

## B. Analysis of the Mitigation Measures

Plaintiffs argue that the Forest Service violated NEPA by failing to analyze the effectiveness of the wildlife mitigation measures.[38] The Forest Service opposes and argues that it sufficiently discussed the mitigation measures so that the environmental consequences were fairly evaluated.[39] An EIS must include a detailed statement regarding any adverse environmental effects that cannot be avoided.[40] "Implicit in this requirement is an understanding that the EIS will discuss the extent to which steps can be taken to mitigate adverse environmental consequences."[41] This discussion must be "in sufficient detail to ensure that environmental consequences have been fairly evaluated," but there is no requirement that a complete mitigation plan be formulated and adopted.[42] Thus, "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act."[43] However, a mere listing of mitigation measures is insufficient.[44] There must be sufficient detail for the court to ensure that the agency took a "hard look" at the "environmental consequences of its proposed action."[45]

Plaintiffs first argue that the Forest Service failed to analyze the effectiveness of wildlife mitigation measures because "[t]he measures are merely listed in the FEIS, with no accompanying scientific data or rationale explaining why they were chosen or whether they will be effective."[46] The Forest Service opposes and

---

38. *Id.* at 13.

39. Clerk's Docket No. 34 at 30.

40. 42 U.S.C. § 4332(2)(C)(ii).

41. *Laguna Greenbelt, Inc. V. United States Dept. of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994).

42. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

43. *Laguna Greenbelt*, 42 F.3d at 528.

44. *Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 872 (9th Cir.2004).

45. *Id.*

46. Clerk's Docket No. 29 at 16. " Plaintiffs also argued that when an agency relies on mitigation to justify its failure to analyze the impacts of an activity, the agency must demonstrate that the mitigation measures will reduce impacts to below NEPA's significance threshold." *Id.* at 15. However, Plaintiffs' argument relies on those decisions concerning whether an EIS should have been prepared, and such decisions have limited relevance to the current dispute. Plaintiffs do not point to any case holding that when an EIS is prepared, the EIS must show that the mitigation measures will reduce environmental impacts to below NEPA's significance threshold. In fact, Plaintiffs fail to distinguish the Supreme Court's holding that NEPA does not contain "a substantive requirement that a complete mitigation plan be actually formulated and adopted." *Robertson*, 490 U.S. at 333, 109 S.Ct. 1835. The purpose of the EIS is to foster informed decision-making; it is not to devise a plan to eliminate environmental impacts. Thus, the Court agrees with the Forest Service that the EIS does not need to show that the mitigation measures will reduce environmental impacts to below NEPA's significance threshold.

argues that the mitigation measures have been reasonably discussed and set forth for the decision-maker.[47] The FEIS devotes less than one page to a discussion of the wildlife mitigation measures. For each action alternative, the following wildlife mitigation measures apply:

1. Helicopters will maintain a 1/2–mile horizontal (ground level) or 1,500 feet above ground level (AGL) from all observed wildlife.

2. Helicopters will not hover, circle, or harass any species of wildlife in any way.

3. CPG will adhere to the No–Fly Zones, which identify mountain goat and Dall's Sheep concentration areas (See No–Fly Zone Maps, Appendix B). No–Fly Zones are based on a separation distance of 1,500 feet from important habitat. The ADFG [Alaska Department of Fish and Game] will be consulted by the Forest Service before any alteration of zone boundaries to less than 1,500 feet.

4. CPG will provide mountain goat, Dall's sheep[48], and other wildlife sightings to the Glacier Ranger District. The District will provide CPG with incidental wildlife observation forms to be filled out daily. These forms are to be submitted annually upon completion of the permit season. Unique wildlife sightings, such as wolves, wolverines, or brown bears, will be reported during the next business day.

5. If a brown bear or wolverine den is located (either by CPG or during wildlife observation flights), CPG will maintain a 1/2 mile horizontal (ground level) or 1,500 AGL separation during their operations.

6. CPG will not ski or conduct any activity within 330 feet of known bald eagle nests.

7. Helicopters will not fly within 1/4–mile horizontal distance or 1,500 AGL of any active bald eagle or goshawk nest. When it is not known whether the nest is active, helicopter flights will avoid the nest. The Glacier Ranger District will provide CPG an updated bald eagle and goshawk nest map prior to each season.[49]

The FEIS states that, as a result of these mitigation measures, (1) "it is unlikely that any action alternative would have a substantial effect on brown bears or impact brown bear populations or viability;"[50] (2) "it is unlikely that any alternative would have a substantial effect on mountain goat populations or viability;"[51] (3) "it is unlikely that any action alternative would have a substantial effect on wolverine or impact wolverine populations or viability;" and (4) "Under all action alternatives, heli-skiing

---

47. Clerk's Docket No. 34 at 17–25.

48. The Court notes that while Forest Service documents often refer to "Dall's Sheep," the more common usage is "Dall Sheep." The Court will use the latter spelling.

49. FEIS at 2–29 through 2–30.

50. In a later section, the FEIS notes that, "[t]he proposed mitigation measure (see Chapter 2) would reduce the potential for direct disturbance, but would not eliminate it, as brown bears den in different locations each year. Identifying emerging brown bears would reduce further disturbance by avoiding the area." FEIS at 4–4.

51. The FEIS in a later section recognizes that, "it is possible that there could be goats wintering outside of the designated no-fly zones. In these instances, some disturbance to individuals could occur. The level of disturbance would depend on the frequency of the skiing activity." FEIS at 4–6.

operation may affect individual sheep, but it is unlikely to have a substantial effect on their populations or viability." [52] The Forest Service was aware that it lacked specific information on the degree of harm to the wildlife, and it designed the mitigation measures "to be conservative enough to protect wildlife species from potential adverse impacts." [53]

■ Despite the brevity of the mitigation measure discussion, this discussion is sufficient for the decision-makers to have fairly evaluated the environmental consequences. As the Ninth Circuit stated, "the line between an EIS that contains an adequate discussion of mitigation measures and one that contains a 'mere listing' is not well defined." [54] Here, there is a more detailed discussion of mitigation measures than what the Ninth Circuit found insufficient in *Neighbors of Cuddy Mountain v. United States Forest Service*.[55] The EIS in *Cuddy Mountain* limited the discussion of mitigation measures to: "[S]mall increases in sedimentation ... would be mitigated by improvements in fish habitat in other drainages.... Offsetting mitigation would include such projects as riparian enclosures (fences around riparian areas to keep cattle out) and fish passage restoration (removing fish passage blockages). These activities can be effective but cannot be quantified with present data." [56] The Ninth Circuit read the EIS to further suggest that:

> [T]he Forest Service did not even consider mitigating measures for the creeks actually affected by the sale, apparently because the Forest Service believes that mitigating measures elsewhere ... could "compensate" for the harms caused to the three creeks in the [affected area]. It is also not clear whether any mitigating measures would be adopted. Nor has the Forest Service provided an estimate of how effective the mitigation measures would be if adopted, or given a reasoned explanation as to why such an estimate is not possible.[57]

Unlike in *Cuddy Mountain*, these mitigation measures are specific to the various wildlife species and concern the areas affected by the CPG permit. Further, the mitigation measures will be adopted because CPG is required to abide by them in the permit. However, like *Cuddy Mountain*, there is no comprehensive analysis of the effectiveness of the measures.

While the mitigation measures discussed in the FEIS are better than those discussed in *Cuddy Mountain*, they are not as detailed as those the Ninth Circuit upheld in *Okanogan Highlands Alliance v. Williams*.[58] In *Okanogan Highlands*, the Forest Service used computer modeling to predict the quality and quantity of environmental effects, a rating system "to determine the probable effectiveness in achieving the mitigation measures objectives," discussed monitoring measures, detailed steps should compliance fail, and identified environmental standards by which mitigation success could be measures.[59]

Similar to the plan in *Okanogan Highlands*, this EIS contains a discussion of why these measures were chosen. In the

52. *Id.* at 2–32 through 2–33.

53. *Id.* at 5–12.

54. *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476 (9th Cir.2000).

55. 137 F.3d 1372 (9th Cir.1998).

56. *Id.* at 1380.

57. *Id.* at 1381.

58. 236 F.3d 468 (9th Cir.2000).

59. *Id.* at 473–74.

Final Environmental Statement Chugach National Forest Land Management Plan Revision ("Plan EIS"), risk ratings for mountain goats and helicopter flights were developed.[60] While the rating system partially relied on "infrequent flights of recreational helicopters in Southcentral Alaska," [61] the FEIS did adopt the "low risk" alternative, which noted that "the lower density of mountain goats, their smaller absolute numbers, and the increased availability of security terrain, the actual number of encounters between helicopters at 1/2 mile or less and goats that react in a moderate or less manner would be small." [62] This goes to the probable effectiveness of the mitigation measures. This level of knowledge does not apply to all wildlife species, and the Forest Service acknowledges that there is no published information concerning the impact of helicopter disturbances on wolverines.[63] However, the FEIS discusses the potential adverse effects on wolverines from helicopters. While the FEIS states that the mitigation measures should alleviate these effects, it also informs the decision-maker that little is known about the exact effect and that monitoring measures are in place.

The Court is not here to substitute its judgment for that of the agency. The Court's role is to ensure that the agency took a hard look at the environmental consequences. Thus, while the Forest Service did not do as much analysis as preferred by Plaintiffs to determine the effects of the

mitigation measures, the FEIS included discussion of the mitigation measures and acknowledged that there is information that is unavailable, particularly with respect to wolverines. Though not perfect, the level of analysis is closer to that present in *Okanogan Highlands* than present in *Cuddy Mountain*. Thus, the Court finds that the agency took a hard look at the environmental consequences of this proposed action.

Plaintiffs present numerous other arguments about problems with the mitigation measures, and the Court finds that all of them are without merit. First, Plaintiffs argue that Forest Service biologists recommended a more stringent separation distance for mountain goats and Dall sheep than adopted in the FEIS. In the Draft Preliminary Wildlife Review Leading to a Specialist Report, Forest Service biologists did recommend that helicopters maintain a separation distance of 1000 meters (approximately 3000 feet) from mountain goats.[64] However, in the final Wildlife Specialist Report, a 1,500 feet separation distance was recommended and subsequently adopted in the FEIS.[65] The Court finds it reasonable for the Forest Service to agree with the distance recommended in the final report, rather than the distance recommended in the draft report.[66] Plaintiffs also argue that a Forest Service biologist recommended a 1,000 meter separation distance on the Kenai Peninsula in a

60. Clerk's Docket No. 34 at Ex. 30 at 10–11. The FEIS tiered to this document. FEIS at 1–7. While the Court agrees with Plaintiffs that the Plan EIS is somewhat outdated, that does not make its analysis irrelevant.

61. Clerk's Docket No. 34 at Ex. 30 at 10.

62. *Id.*

63. *Id.* at 25.

64. Clerk's Docket No. 29 at Ex. 11 at 3.

65. Clerk's Docket No. 34 at Ex. 32 at 19.

66. Further, the Wildlife Specialist Report noted that, "No significant difference was found in frequency or magnitude of disturbance response when goat groups were exposed to flights at 500m as compared to those at 1000m." *Id.* at Ex. 32 at 9.

separate report.[67] However, this report merely presented the different levels of impact at various separation distances, and noted that a separation distance of 1,000 meters created the least risk of disturbing the mountain goats.[68] The Report did not contain an actual recommendation.

Second, Plaintiffs argue that the Forest Service ignored the Alaska Department of Fish and Game ("ADF & G") because it did not adopt "true no fly zones." [69] This argument relates to Plaintiffs' earlier argument that the Forest Service was required to eliminate all significant impacts to wildlife. Given that the Court already held that there is no such requirement when an EIS is prepared, it is irrelevant that the Forest Service did not adopt the ADF & G's plan to eliminate all significant impacts.

Third, Plaintiffs argue that the documents in the Administrative Record do not support the Forest Service's contention that the mitigation measures are adequate to reduce the impacts on wolverines and brown bears to below the significance threshold.[70] Plaintiffs primarily rely on a proposal by Forest Service biologist Mary Ann Benoit.[71] Her recommendations regarding wolverines included that helicopters maintain a separation distance of 1000 AGL during flights, and that there be no take-offs, landing, or heli-skiing in wolverine denning areas.[72] The FEIS provides for a 1,500 AGL and contains no restrictions for take-offs and landings.[73] However, the more recent Wildlife Specialist Report, co-authored by Mary Ann Benoit, recommended a 1,500 AGL and made no restrictions for take-offs or landings.[74] It was not unreasonable for the agency to rely on the more recent report. Regarding brown bears, Plaintiffs argue that Forest Service biologists recommended more stringent timing for when heli-skiing activity should end each year.[75] In one report, a Forest Service biologist stated that a "conservative approach" would be to limit heli-skiing after mid-March.[76] Again, this author was also a co-author of the later-published Wildlife Specialist Report.[77] The Wildlife Specialist Report noted that CPG proposed to operate through April 20 and it did not recommend an earlier end date.[78] Thus, it is not clear that the Forest Service biologists actually recommended more stringent timing than adopted in the FEIS.

Fourth, Plaintiffs argue that the Administrative Record casts doubt on whether the mitigation measures can be fully implemented.[79] However, there is no requirement for complete efficacy.[80] As already discussed, when an EIS is prepared, it is enough that mitigation measures are discussed in sufficient detail so that the environmental consequences can be fairly evaluated.

---

67. Clerk's Docket No. 29 at 20.

68. *Id.* at Ex. 16 at 15.

69. *Id.* at 21.

70. *Id.* at 23.

71. *Id.* at Ex. 10.

72. *Id.* at Ex. 10 at 7.

73. FEIS at 2–29 through 2–30.

74. Clerk's Docket No. 34 at Ex. 32 at 20.

75. Clerk's Docket No. 29 at 26.

76. *Id.* at Ex. 14 at 2.

77. Clerk's Docket No. 34 at Ex. 32 at 1.

78. *Id.* at Ex. 32 at 3.

79. Clerk's Docket No. 29 at 27.

80. *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994).

Finally, Plaintiffs argue that notes from a CPG meeting held on July 30, 2004, demonstrate that people at this meeting thought that the draft EIS violated NEPA.[81] The meeting notes state: "The DEIS needs to explain the effectiveness of the mitigation measures used to protect wildlife. The DEIS relies heavily on these mitigation measures and there is nothing in the DEIS that explains their effectiveness. Violates 40 CFR 1502.14(f); 40 CFR 1502.16(h)."[82] Mere belief that a statute is violated does not mean that it is, nor is it dispositive of the matter at issue.

## C. Analysis of Direct, Indirect, and Cumulative Impacts

NEPA requires that an EIS discuss: (1) Direct effects and their significance; (2) Indirect effects and their significance; and (3) the cumulative impact of the proposed action.[83] Plaintiffs argue that "when there is uncertainty regarding the degree or intensity of environmental impacts, it is insufficient for an agency to simply describe the effects as 'unknown' because they are 'unstudied.'"[84] However, Plaintiffs' argument is premised on a decision concerning whether an agency should have prepared an EIS, and not the adequacy of an EIS.[85] Thus, such a decision is less relevant to the current discussion of the adequacy of the EIS. Further, in a decision concerning the adequacy of an EIS, the Ninth Circuit stated, "If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects are known, it is doubtful that any project could ever be initiated."[86]

■ Plaintiffs' first substantive argument is that the FEIS fails to provide baseline data regarding wildlife populations.[87] There is no baseline data for the geographic distribution of brown bears, wolverines, or their dens in the permit area. Moreover, the actual population of brown bears, wolverines, mountain goats, and Dall sheep in the region is unknown. The Plaintiffs rely on *Half Moon Bay Fishermans' Marketing Association v. Carlucci*[88], a decision concerning "dumping the heavily contaminated dredgings into the ocean and then 'capping' them with uncontaminated material to secure them" to argue that baseline data is required.[89] In *Half Moon Bay*, the Ninth Circuit concluded that it was necessary to establish baseline conditions prior to the project to ensure NEPA compliance; however, this statement is dicta as the EIS was ultimately upheld.[90] Further, while the *Half Moon Bay* decision concerned the potential, permanent disposal of contaminated dredged material, the impact here is not nearly so severe. Here, the agency recognized that information was lacking, but provided mitigation measures to lessen the impact, including monitoring the affected wildlife, if spotted, and ongoing studies.

Second, Plaintiffs argue that the FEIS fails to analyze the direct effects of heli-

81. Clerk's Docket No. 29 at Ex. 22.

82. *Id.*

83. 40 C.F.R. §§ 1502.16(a)—(b), 1508.7, 1508.8.

84. Clerk's Docket No. 29 at 29.

85. Plaintiffs' argument was based on *National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722 (9th Cir.2001).

86. *Jicarilla Apache Tribe v. Morton,* 471 F.2d 1275, 1280 (9th Cir.1973).

87. Clerk's Docket No. 29 at 30.

88. 857 F.2d 505 (9th Cir.1988).

89. *Id.* at 510.

90. *Id.*

skiing on wildlife.[91] The Forest Service disagrees. Chapter Four of the EIS examines the direct effects generally for wildlife, and specifically for the brown bear, mountain goat, and wolverine. Thus, the direct effects are discussed, though the discussion's impact is lessened because of repeated statements that the mitigation measures should reduce impacts to below significant levels. Further, Plaintiffs argue that the direct effects discussed were insufficient.[92] For example, one direct effect mentioned is the potential for displacement of wolverines, but there is no quantitative or detailed information about the nature and extent of the displacement. However, while this FEIS is not a hallmark of specificity, it acknowledges the potential direct effects to the different wildlife species, even if the exact details are unknown.

Third, Plaintiffs argue that the FEIS fails to analyze the indirect effects of heli-skiing on wildlife.[93] In the discussion of general wildlife effects in the FEIS, there are two paragraphs devoted to indirect effects.[94] These effects include, "[p]hysiological responses such as increased heart rate or stress hormone levels," and "easy travel routes for predators," and that it is uncertain whether the physiological responses will cause long-term harm and it is unlikely that a heli-ski run will create an easy travel route for predators.[95] In the discussion of the brown bear, mountain goat, and wolverine, the FEIS merely states that no indirect effects are expected.[96] For Dall sheep, the FEIS notes that the physiological response could lead to reduced reproduction and reduced predators, but that these effects are unlikely due to the mitigation measures.[97] Thus, the FEIS sufficiently informed the decisionmakers of the potential effects. The fact that no indirect effects are expected for many species does not mean that the agency failed to take a hard look at the potential environmental consequences.

Fourth, Plaintiffs argue that the FEIS fails to analyze the cumulative effects on wildlife from past, present, and reasonably foreseeable future activities.[98] For an EIS to consider cumulative impacts, "some quantified or detailed information is required."[99] Thus, "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."[100] The FEIS contains a discussion of cumulative effects in Chapter Four.

Plaintiffs argue that the FEIS should have contained more discussion on the cumulative impact due to the growth of snowmachining and winter backcountry recreation.[101] However, both the Plan EIS and the FEIS recognize that there are increased motorized and non-motorized winter recreation activities in the Chugach National Forest. For brown bears, the FEIS states that such activities "may result in cumulative disturbance that could

**91.** Clerk's Docket No. 29 at 32.

**92.** *Id.* at 33–36.

**93.** *Id.* at 38.

**94.** FEIS at 4–3.

**95.** *Id.*

**96.** *Id.* at 4–5 through 4–9.

**97.** *Id.* at 4–12.

**98.** Clerk's Docket No. 29 at 39.

**99.** *Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1379 (9th Cir.1998).

**100.** *Id.* at 1380.

**101.** Clerk's Docket No. 29 at 39.

impact individual brown bear. As winter recreation uses continues to expand, the overall cumulative effect is uncertain."[102] The FEIS recognized the growth of such activities, as well as the potential effects on the wildlife.[103]

Plaintiffs also argue that the FEIS failed to provide any quantified or detailed information regarding cumulative impacts on wildlife from summer recreational activities, such as off-road vehicles, hunting, fishing, trapping and hiking.[104] While the FEIS did not include a discussion of cumulative impacts due to summertime activities, a Supplemental Information Report ["SIR"] was prepared that examined "whether any potential cumulative impacts exist from summer uses in the project area that would be relevant to environmental concerns with the project."[105] The SIR concluded that "the cumulative effects from summer uses do not rise to the level of significance under NEPA."[106] This conclusion was based, in part, on the fact that there is a "distinct separation between summer and winter uses in time and space."[107] The fact that Plaintiffs disagree with this conclusion does not mean that the agency failed to take a hard look, and the SIR provided analysis of the potential cumulative impacts from summer uses.

Fifth, Plaintiffs argue that the FEIS failed to analyze the impacts of future helicopter supported recreation.[108] While meeting notes recognized that the FEIS should contain such a discussion, Defendants argue that there are no specific proposals for other helicopter supported recreation activity.[109] However, this ignores that permits have been granted for other helicopter supported activities in the area[110] and that it is reasonable to anticipate more growth in the future. For the permits already granted, the FEIS recognized this increased usage. For the possibility of more growth, it is not necessary for the FEIS to consider the cumulative impacts for less imminent actions.[111]

Sixth, Plaintiffs argue that the FEIS fails to analyze past, present, and future habitat loss and degradation on the Kenai Peninsula.[112] But, Plaintiffs acknowledge that habitat loss occurs from other activities besides heli-skiing.[113] Further, the FEIS discusses the potential in the future for cumulative impacts due to habit degradation and stress from heli-skiing.

Finally, Plaintiffs argue that the Forest Service relies too heavily on future wildlife studies rather than having conducted the

102. FEIS at 4–6.

103. *See id.* at 4–12 through 4–22.

104. Clerk's Docket No. 29 at 40.

105. Clerk's Docket No. 34 at Ex. 28 at 1.

106. *Id.* at Ex. 36 at 4.

107. *Id.*

108. *Id.*

109. Clerk's Docket No. 34 at 37.

110. FEIS at 3–6.

111. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (noting that an agency is not required to "consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment, and the condition of that environment presumably will reflect earlier proposed actions and their effects.").

112. Clerk's Docket No. 29 at 42.

113. Clerk's Docket No. 40 at 21.

needed studies before heli-skiing.[114] The mere fact that the Forest Service is planning more studies does not mean that what it has done already is inadequate. The question is whether there was enough scientific knowledge for decision-makers to take a hard look, and the fact that the Forest Service wants more information does not mean that it failed to comply with NEPA. The Court concludes that the analysis of direct, indirect, and cumulative impacts is adequate.

### D. Analysis of Alternatives

Plaintiffs argue that the FEIS violates NEPA because it erroneously rejected certain alternatives on the grounds that they were not viable.[115] NEPA requires the EIS to analyze "alternatives to the proposed action." [116] The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," and for eliminated alternatives, briefly discuss the reasons for their elimination.[117] "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." [118]

The Court reviews the EIS's range of alternatives under the "rule of reason." [119] Under the rule of reason, the EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." [120] "The touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." [121]

The alternatives considered in the FEIS are set forth in Chapter Two. In Chapter One, the FEIS stated that the alternative chosen needed "to provide an adequate number of permitted days and permitted areas so that the operation is feasible given changing weather and snow conditions throughout the season." [122] The FEIS then describes the developed alternatives that were not studied in detail.[123] Of these, two alternatives, B and 6, were rejected because they would not support viable heli-skiing operations.[124] Of the alternatives studied in detail, Alternatives 4, 5, and 9 were also rejected because they would not support a viable heli-ski operation.[125]

First, Plaintiffs argue that if the Forest Service erred regarding what was necessary for CPG's viability, then it failed to support its conclusion that Alternatives B and 6 did not need to be analyzed in detail in the FEIS.[126] Second, Plaintiffs argue that if the economic viability assumptions were misleading, then the Forest Service's analysis of Alternatives 4,5, and 9 failed to provide an accurate assessment upon which to evaluate the proposed project.[127]

---

114. *Id.*

115. Clerk's Docket No. 27 (filed under seal).

116. 42 U.S.C. § 4332(2)(C).

117. 40 C.F.R. § 1502.14(a).

118. *Westlands Water Dist. v. United States Dep't of Interior,* 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted).

119. *Id.*

120. *Id.* (citation omitted).

121. *Id.* (citation omitted).

122. FEIS at 1–6.

123. *Id.* at 2–1 through 2–2.

124. *Id.* at 2–2.

125. ROD at 13–14.

126. Clerk's Docket No. 42 at 46.

127. *Id.*

The FEIS relied on CPG's assessment that it needed a minimum of 1,200 client days to achieve a profit, while the optimum would be in the 1,800 to 2,400 day range.[128] A regional economist for the Forest Service disputes some of the assumptions relied on to determine viability, but does not dispute the number of days needed for viability.[129] Plaintiffs argue that the Forest Service erred by focusing solely on the number of client days and should have considered other factors, such as the large capital expenditures and increased logistical costs with the expansion to more areas and staging areas.[130] While these other factors are relevant, they do not eliminate the fact that an adequate number of client days is a necessary prerequisite to viability. Thus, it was not unreasonable for the FEIS to reject those alternatives that did not have enough client days, even absent the other possible factors that could have been considered.

## V. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment is DENIED (clerk's Docket No. 29).

---

**128.** FEIS at 4–36.

**129.** Clerk's Docket No. 27 at Ex. 42.

**130.** Clerk's Docket No. 40 at 23–24.