McKEOWN, Circuit Judge,
dissenting:
The Ninth Circuit, like the other circuits, repeats frequently the legal mantras of administrative review in the context of environmental decisions: “arbitrary and capricious,” “hard look,” and “no second guessing.”[1] These standards are easy to *1072 articulate, but it is more difficult to know when we have crossed the line from reviewer to decisionmaker. In this case, we have gone too far.
As summarized in Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d 1372, 1376 (9th Cir.1998), we review agency actions “to determine if they were arbitrary or capricious, an abuse of discretion, or not in accordance with law.” The limited nature of this inquiry underscores the latitude in implementation and interpretation that Congress intended for its agents. This latitude does not relieve us of our duty to insure that the agency took a “hard look,” as required under the National Environmental Policy Act (“NEPA”), or' to insure compliance with forest plans under the National Forest Management Act (“NFMA”). Nor does record review mean that'we abdicate our obligation to scrutinize the agency’s underlying data, assumptions, and conclusions. As a reviewing court, we play a critical role in the review process and we have not been, shy in letting the U.S. Forest Service know where it has fallen short as a matter of law and process.[2] However, the majority’s extension of Lands Council v. Powell, 379 F.3d 738 (9th Cir.2004), amended by 395 F.3d 1019, 1024 (9th Cir. 2005), represents an unprecedented incursion into the administrative process and ratchets up the scrutiny we apply to the scientific and administrative judgments of the Forest Service. Because the majority has, in effect, displaced “arbitrary and capricious” review for a more demanding standard, I respectfully dissent.
The project under review is designed to address the aftermath of the Lolo National Forest wildfires in Montana in 2000 through selected thinning of smaller timber, salvage of timber, prescribed burning and regeneration of thousands of acres. The administrative record in this case is huge — a 1900 + page Final Environmental Impact Statement (FEIS), 150 detailed maps and 20,000 pages of background information. The majority highlights only parts of this record, criticizes the qualifications of the Forest Service’s personnel, and questions various scientific judgments. In faulting the Forest Service’s soil quality analysis and concluding that old-growth forest will not be impaired, the majority changes our posture of review to one where we sit at the table with Forest Service scientists and second-guess the minutiae of the decisionmaking process.
My concern is perhaps best illustrated in the majority’s application of Lands Council to the soil quality analysis issue. In Lands Council, we addressed the Forest Service’s analysis of disturbed soil conditions in a watershed restoration project in the Idaho Panhandle National Forest. The Forest Service had taken soil samples from throughout the forest but not in the activity area. Id. at 1035. Based on these samples and aerial photographs, it calculated the impact of the watershed restoration project on soil quality in the activity area. Id. at 1034.
*1073 In Lands Council, we rejected the Forest Service’s choice of scientific methodology because it did not walk or test soil in the activity area. Id. We concluded that the “Forest Service’s reliance on the spreadsheet models, unaccompanied by on-site spot verification of the model’s predictions, violated NFMA.” Id. at 1035. Given the specific record and circumstances in Lands Council, this resolution may have made perfect sense. But in the abstract, without the ability to compare the record in Lands Council with the record here, there is no legal basis to conclude that the NFMA requires an on-site analysis where there is a reasonable scientific basis to uphold the legitimacy of modeling. NFMA does not impose this substantive requirement, and it cannot be derived from the procedural parameters of NEPA.
Application of Lands Council makes even less sense in this specific case. Here, the Forest Service conducted exactly the kind of on-site analyses found lacking in Lands Council — soil samples in activity areas. The record lists five activity areas surveyed in soil sample transects and details the walkthrough of a number of activity areas. The majority concedes that these on-site analyses exist but criticizes them for being too few and of poor quality.[3] Resting on this characterization, the majority- rejects the Forest Service’s soil analysis on the ground that it was “nearly identical” to the one we found lacking in Lands Council.
Lands Council makes compliance with NFMA and NEPA a moving target. If one reads Lands Council to require on-site analysis in every case, which I respectfully suggest is an over-reading of the case, the circumstances here comply with that dictate. Yet the majority now says, without support in the record and absent a challenge by Ecology Center at the administrative level, that the on-site analysis was insufficient and that we do not possess enough information to know if the inspectors were qualified. From this judgment, we are left to conclude that not only does the court of appeals set bright-line rules, such as requiring an on-site, walk the territory inspection, but it also assesses the detail and quality of that analysis — even in the absence of contrary scientific evidence in the record. Page after page of the record contains details on field analysis, such as the following representative sample of an evaluation form:
*1074 [[Image here]]
In my view, it is not our role to criticize this evaluation because, for example, the form does not list the evaluator’s qualifications. Nor are we in a position to un-
scramble and pass judgment on the investigator’s field notes, as in the following excerpt, which are summarized and integrated into the FEIS:
*1075 [[Image here]]
Had Ecology Center offered a credible scientific critique of this methodology or provided some other basis for us to determine whether the Forest Service’s judgment was arbitrary and capricious, we would be in a different position. But just as we are not supposed to substitute our judgment for that of the Forest Service, neither can we rely on-in the absence of evidence — Ecology Center’s arguments in its briefs or in its expert declaration filed after the administrative review process.
Lands Council does not direct us to assess the sufficiency of the Forest Service’s on-site soil quality analyses beyond the traditional arbitrary and capricious standard; it only asks us to verify that there is such an on-site sampling. That opinion stated four times that the Forest Service had failed to conduct any on-site analysis — it did not say that the Service failed to conduct enough of them.[4] The majority now extends the “on-site soil analysis” doctrine, initiated by Lands Council, while abandoning its reasoning. Although on-site analysis could plausibly be conducted in such a manner as to be arbitrary and capricious, the majority’s *1076 justification for finding this project to be arbitrary and capricious imports a bright-line rule where individualized analysis is appropriate.
More importantly, in Lands Council we did not purport to create a general rule requiring on-site verification for all scientific hypotheses adopted by the Forest Service regardless of context. We did not even adopt a rule requiring all soil analy-ses to be verified by on-site sampling. Our decision was specific to the facts of that case. See Lands Council, 395 F.3d at 1035 (“Under the circumstances of this case, the Forest Service’s ... methodology, to be reliable, required that the hypothesis and prediction of the model be verified with observation.”) (emphasis added).
Nevertheless, the majority generalizes the “unverified hypothesis” principle articulated in Lands Council beyond the soil analysis context to other scientific findings made by the Forest Service. In so doing, the majority demonstrates the dangers of extending a reference — abstracted from a single, technically detailed, fact-specific decision — to unrelated factual contexts. For example, regarding the old-growth claim, the majority reverses the Forest Service’s judgment because “[hjere, as in Lands Council, the Forest Service’s conclusion that treating old-growth forest is beneficial to dependent species is predicated on an unverified hypothesis.” Op. at 16039. The Forest Service hypothesis is, however, supported by observational data. There is record evidence, based on direct observation, that treatment produces and preserves habitat for old-growth dependent species.[5]
The majority applies Lands Council to prohibit the Forest Service from inferring simply that because treating old-growth preserves or creates habitat for dependent species does not mean that such treatment will not harm the species. Op. at 1064 (claiming that the Forest Service just “assumes that a species’ viability is maintained so long as the requisite amount of the species habitat is maintained”). In reaching this conclusion, the majority acknowledges and then dismisses without explanation the very record evidence it says the Forest Service failed to provide — here, direct observation of certain species seen foraging in old-growth areas after treatment.[6]
Applying Lands Council to the old-growth issue is inappropriate for yet another reason. The panel assumes that Alternative 5, which involves thinning, salvage, and regeneration, disrupts a stable status quo “through an invasive process.” Op. at 1064. Yet the status quo is anything but stable. The Forest Service presents uncontested evidence that the failure to treat old-growth areas risks the very harms feared by Ecology Center, even though it has provided no evidence to support such a claim. Op. at 1064 (“Ecology *1077 Center does not offer proof that the proposed treatment causes the harms' it fears_”). In fact, the record reveals that the failure to treat old-growth areas could result in “considerable loss of old growth trees from bark beetle predation,” which will put “at risk ... specific habitat niches for many wildlife species that are adapted to the more open growth old-forest character.” Old-growth areas “are now at risk for major disturbances such as disease and insect epidemics and high'-severity stand replacing fires.” Inaction or delay threatens the species Ecology Center seeks to protect.
No one contests the Forest Service’s conclusion that treatment will “provide direct reduction of bark beetle infestation or risk of future infestation.” Faced with uncontroverted evidence that inaction may harm old-growth areas, the majority still requires the Forest Service to produce more evidence that treating old-growth will not harm dependent species before it will allow the Service to save old-growth areas from other dangers. Under these circumstances, I cannot agree that the Forest Service’s decision to treat old-growth areas was arbitrary and capricious. Indeed, had the Forest Service taken the majority’s approach, its decision may well have been arbitrary and capricious for “failing] to consider an important aspect of [the] problem.” See Lands Council, 395 F.3d at 1026.
Nor do I think it appropriate to analogize the Forest Service process to the separate and wholly inapposite regime of the Food and Drug Administration (“FDA”). The majority writes that “it would be arbitrary and capricious for a pharmaceutical company to market a drug to the general population without first conducting a clinical trial” just as the Forest Service cannot be permitted to “treat more and more old-growth forest without first determining that such treatment is safe and effective for dependent species.” See Op. at 1064. Without commenting on the obvious differences between humans and trees (and in fact acknowledging the importance of both to our environment), this analogy underscores the degree to which the majority inserts itself into the internal judgments of the Forest Service. The FDA process dictates a substantive and specific administrative course of action in terms of clinical trials and other requirements as a prelude to the approval of drugs and medical devices. Neither NEPA nor NFMA serve that function in the environmental context. To import the notion of clinical trials from the FDA context to soil sampling in federal forests is a leap too far.
Apparently we no longer simply determine whether the Forest Service’s methodology involves a “hard look” through the use of “hard data,” but now are called upon to make fine-grained judgments of its worth. In reaching this conclusion, the majority takes aim at two firmly established lines of precedent in administrative law. First, this view is contrary to the basic principle that we reverse agency decisions only if they are arbitrary and capricious. This standard of review does not direct us to literally dig in the dirt (or soil, as it were), get our fingernails dirty and flyspeck the agency’s analysis. Yet the majority does exactly that by rejecting the Forest Service’s soil analysis field checks and its observations and historical data in treated old-growth forests. The majority’s rationale cannot be reconciled with our case law requiring “[d]eference to an agency’s technical expertise and experience,” particularly “with respect to questions involving engineering and scientific matters.” United States v. Alpine Land & Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989). See also Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, *1078 871(9th Cir.2004) (reversing a district court decision that certain alternatives violated NEPA because of inadequate deference to the agency’s expertise).
Because the majority’s analysis cannot be squared with the deferential review required of us, I respectfully dissent.

. See, e.g., Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998) (noting that we review Forest Service actions under the APA and the National Forest Management Act to determine if they were "arbitrary and capricious”); Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 963 (9th Cir.2002) (requiring a "hard *1072 look” by agencies at environmental effects of projects); Idaho Sporting Cong., Inc. v. Thomas, 137 F.3d 1146, 1150 (9th Cir.1998) (noting that courts should not "second guess [] an agency’s scientific conclusions” and, for that reason, requiring hard data to discourage second guessing).

. See e.g. Natural Res. Def. Council v. U.S. Forest Serv., 421 F.3d 797, 816 (2005) (holding that the Forest Service’s timber sale plan was arbitrary and capricious, and violated NEPA, because it was based on a clear misinterpretation of data on market demand for the timber); Idaho Sporting Cong. v. Thomas, 137 F.3d at 1154(holding that a Forest Service plan violated NEPA because it had failed to take a "hard look” at the environmental effects of the proposed timber sale).

. See Op. at 1069 n. 11 (finding the Forest Service's soil transects "did not cover the vast majority of the activity areas; only a few were crossed by coincidence”); see, e.g., id. at 1070 (“The record provides little information that enables us to assess the reliability or signifi-canee of these reports; ... we do not know the qualifications of the persons conducting the field review, the methodology utilized. ...”). To paraphrase an old joke, the majority found the food terrible and the portions small.

. See id. at 1034(''The Forest Service did not walk, much less test, the land in the activity area.”); id. at 1035 ("The predictions of the model ... were not verified with on the ground analysis.”); id. ("[T]he spreadsheet models, unaccompanied by on-site spot verification ..., violated NFMA.”); id. (The "soils analysis was based entirely on the model with no on-site inspection ....”) (emphasis added).

. For example, a report by Forest Service scientists utilized historic and stand structure research to plan for treatment that would enhance habitat for plants and species. The scientists found that treated areas have nesting and foraging opportunities for cavity nesting species such as pileated woodpeckers.

. The majority fails to acknowledge that we “have, in appropriate cases, allowed the Forest Service to avoid studying the population trends of [species] by using ... habitat as a proxy for ... population trends.” Lands Council, 395 F.3d at 1036. In Lands Council, we rejected a proxy-on-proxy approach for measuring population trends in old-growth forest because the habitat data the Forest Service offered was "fifteen years old, with inaccurate canopy closure estimates, and insufficient data on snags.” Id. The majority does not identify any such problems in using the proxy-on-proxy approach in this case. See Op. at 1064.